IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION



FILED

10 APR -5  PM 12: 27

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

-------------------------------------------------  :
Douglas Coley,                                     :
                                                   : CASE NO. 1:02CV0457
                          Petitioner               :
                                                   :
                                                   :
            -vs-                                    : MEMORANDUM OF OPINION AND
                                                   : ORDER DENYING PETITION FOR
Margaret Bagley, Warden,                           : WRIT OF HABEAS CORPUS
                                                   :
                                                   :
                          Respondent               :
-------------------------------------------------  : **DEATH PENALTY**


UNITED STATES DISTRICT JUDGE LESLEY WELLS

## TABLE OF CONTENTS

I. FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . .  2
    A.    The Murder and Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
        1.    Facts of the crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
        2.    Pre-trial proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
        3.    Culpability Phase of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
        4.    Penalty Phase of Trial  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
    B.    Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
    C.    Post-conviction Relief Proceedings  . . . . . . . . . . . . . . . . . . . . . . . .  15
        1.    Post-conviction relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
        2.    Application to Re-Open Direct Appeal  . . . . . . . . . . . . . . . . . .  16
    D.    Federal Petition for Writ of Habeas Corpus  . . . . . . . . . . . . . . . . .  18
        1.    Motion for Discovery  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
        2.    Motions to Amend the Petition  . . . . . . . . . . . . . . . . . . . . . . . .  19
        3.    Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

II. LAW AND ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
    A.    The Applicability of AEDPA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
    B.    AEDPA Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
    C.    Prerequisites to Section 2254 Habeas Relief  . . . . . . . . . . . . . . . .  29
    D.    Procedural Default  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29
        1.    General Law of Procedural Default . . . . . . . . . . . . . . . . . . . . .  29
        2.    Specific Grounds for Relief Involving Procedural Default  . . .  33
            a.    Grounds for Relief 1, 2, 3, 6(c),(d),(f), 8, 9, 10(g), 11(b),
                (c), 12, 14(a), (b),16, 17, 19, 20, 21 – Claims Never Raised
                in State Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33
            b.    Grounds for Relief 4(a),(b),(c),(d),(e),(f),(n), 5(b)(c)(d)(e),
                10(f), (h),(i) – Sub-Claims Raised Under Different
                Theories in State Court.  . . . . . . . . . . . . . . . . . . . . . . . . .  34
            c.    Grounds for Relief 6(a),(b), 7, and 14(c),(e) – Claims to
                Which the Ohio Supreme Court Applied a Plain Error
                Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36
            d.    Mr. Coley's defenses to the procedural default bar  . .  37
                i.    Cause and Prejudice . . . . . . . . . . . . . . . . . . . . . . .  37
                a.    Ineffective Assistance of Appellate Counsel  .  37
                    b.    Application to Re-Open Direct Appeal  .  38
                      c.    Counsel's Failure to File a Post-conviction
                        Relief Petition . . . . . . . . . . . . . . . . . . . . . .  40
                ii.    Miscarriage of justice exception . . . . . . . . . . . .  41
    E.    Merit Review of Procedurally Defaulted Claims . . . . . . . . . . . . . . . .  43
        1.    Juror Misconduct: First Ground for Relief . . . . . . . . . . . . . . .  43
        2.    Improperly Dismissed Jurors: Second Ground for Relief  . .  49
        3.    Batson Claim: Third Ground for Relief . . . . . . . . . . . . . . . . .  52

4.     Ineffective Assistance of Trial Counsel: Grounds for Relief
       4(a), (b), (c), (d), (e), (f), (n), and 10(f), (g), (h), and (i)  . . . . . 55
       a.     <u>Strickland v. Washington</u> and its progeny  . . . . . . . . . 55
       b.     Fourth Ground for Relief . . . . . . . . . . . . . . . . . . . . . . . 56
              i.    Sub-claims (b) –  gruesome and cumulative
                    photos, (c) –  improper jury instructions, and (f) –
                    objections to nonstatutory aggregating factors
                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
              ii.   Sub-claim (a) –  change of venue  . . . . . . . . . . 57
              iii.  Sub-claim (d) – failure to merge convictions and
                    death sentences  . . . . . . . . . . . . . . . . . . . . . . 58
              iv.   Sub-claim (e) – failing to request intent to kill
                    instructions  . . . . . . . . . . . . . . . . . . . . . . . . . 59
              v.    Sub-claim (n) –  "opening door" for the State  . 59
       c.     Ground for Relief 10(f) evidence of aggravating factors,
              (g) failure to request instruction, (h) prosecutor's
              comments, and (i), failure to object  . . . . . . . . . . . . . . 61
              i.    Sub-claims (f) – evidence of aggravating factors,
                    and (h) –  prosecutor's comments  . . . . . . . . . . 61
              ii.   Sub-claim (g) – failure to request instruction  . 61
              iii.  Sub-claim (i) – failure to object  . . . . . . . . . . . . 62
5.     Prosecutorial Misconduct: Grounds for Relief 5(b),(c),(d), and
       (e) – Gruesome Photos, Victim Impact, Improper Questions
       and Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
       a.     Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . . 63
       b.     Sub-claims (b) and (c) – gruesome photos and victim
              impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
       c.     Sub-claim (d) – religion . . . . . . . . . . . . . . . . . . . . . . 64
       d.     Sub-claim (e) – failure to testify during mitigation  . . 65
6.     Trial Court Error: Grounds for Relief 6(a), (b), (c), (d), and (f)
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
       a.     Sub-claims (a), (b), and (c) – jury instructions, gruesome
              photos and victim impact . . . . . . . . . . . . . . . . . . . . . 67
       b.     Sub-claim (d) – recusal of judge . . . . . . . . . . . . . . . 67
       c.     Sub-claim (f) – Catchall Trial Error . . . . . . . . . . . . . . 70
7.     Gruesome Photographs: Seventh Ground for Relief  . . . . . . 70
8.     Incomplete Transcripts: Eighth Ground for Relief  . . . . . . . 72
9.     Cumulative Error: Ninth Ground for Relief . . . . . . . . . . . . . 73
10.    Consideration of Non-Statutory Aggravating Factors: Twelfth
       Ground for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
       a.     Sub-claims (c), (d), and (f) – failure to recuse, gruesome
              photos, catch-all  . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
       b.     Sub-claim (a) – David Moore offenses  . . . . . . . . . . . 74
       c.     Sub-claim (b) – victim impact . . . . . . . . . . . . . . . . . . 76

        d.       Sub-claim (e) – Marquita Armstrong . . . . . . . . . . . . . 76

    11.   Consideration of Mitigating Evidence: Ground for Relief
        Thirteen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

    12.   Improper Jury Instructions: Ground for Relief Fourteen . . . 77
        a.       Sub-claim (a) – sympathy consideration . . . . . . . . . . 78
        b.       Sub-claim (b) – "principal offender" instruction . . . . 79
        c.       Sub-claim (c) – "prior calculation and design"
                instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
        d.       Sub-claim (d) – unconstitutional aider/abettor
                instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
        e.       Sub-claim (e) – reasonable doubt instructions . . . . . . 81

    13.   Improper Standard of Review: Ground for Relief Sixteen . . 82

    14.   Post-conviction Relief a Meaningless Review: Ground for
        Relief Seventeen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    15.   Aggravating Circumstances Did Not Outweigh Mitigating
        Factors: Ground for Relief Nineteen . . . . . . . . . . . . . . . . . . 84

    16.   Improper Burden Shifting: Ground for Relief Twenty . . . . . . 85

    17.   Ohio Statutes Fail to Narrow the Class of Death-Eligible
        Defendants: Ground for Relief Twenty-One . . . . . . . . . . . . . 86

F.   <u>Merit Review of Non-Defaulted Claims</u> . . . . . . . . . . . . . . . . . . . . . . . 87

    1.   Ineffective Assistance of Trial Counsel: Grounds for Relief
        4(g), (h), (i), (j), (k), (l), and (m) . . . . . . . . . . . . . . . . . . . . . . . 87
        a.       Sub-claim (g) – indictment lacked elements of specific
                intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
        b.       Sub-claim (h) – removal of trial judge . . . . . . . . . . . . 90
        c.       Sub-claim (i) – victim impact . . . . . . . . . . . . . . . . . . . 91
        d.       Sub-claim (j) – indictment lacked elements of specific
                intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
        e.       Sub-claims (k) and (l) – ineffectiveness of counsel
                regarding prosecutorial misconduct . . . . . . . . . . . . . 92
        f.       Sub-claim (m) – failure to object to instructions . . . . . 93

    2.   Prosecutorial Misconduct: Ground for Relief 5(a) –
        inconsistent state theories . . . . . . . . . . . . . . . . . . . . . . . . . . 94

    3.   Trial Court Errors:  Grounds for Relief 6(e) and (g) –
        transcripts and severing counts . . . . . . . . . . . . . . . . . . . . . 96
        a.       Sub-claim (e) – transcripts . . . . . . . . . . . . . . . . . . . . 96
        b.       Sub-claim (g) – failure to sever counts . . . . . . . . . . . 98

    4.   Ineffective Assistance of Counsel During Mitigation: Grounds
        for Relief 10(a), (b), (c), (d), and (e) . . . . . . . . . . . . . . . . . . . . 101
        a.       Sub-claim (a) – mitigation . . . . . . . . . . . . . . . . . . . . . 101
        b.       Sub-claims (b) – failure to request trial judge to recuse
                herself, (c) – failure to object to victim impact testimony,
                (d) – failure to object to State's argument victim
                performed good deeds, and (e) – failure to object to

State's argument that victim felt fear before her death
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

5.  Ineffective Assistance of Appellate Counsel: Eleventh Ground
for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

6.  No Meaningful Proportionality Review: Fifteenth Ground for
Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

7.  Unconstitutionality of Death Penalty: Eighteenth Ground for
Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

**Wells, J.:**

In May 1998, a jury convicted Petitioner Douglas L. Coley of the kidnapping, robbery, and attempted murder of David Moore and the kidnapping, robbery, and aggravated murder of Samar El-Okdi with firearm specifications and the specification that the murder was committed during a kidnapping or robbery.  After a sentencing hearing, the jury recommended that Mr. Coley be sentenced to death.  The trial court accepted the jury's death sentence recommendation and also sentenced Mr. Coley to ten years on the kidnapping, robbery, and attempted murder charges to be served consecutively and sentenced him to three years, to be served concurrently, for the firearm specifications attendant to counts 1, 2, 3, 4, 5, 6, 7, and 8 in the indictment.

On 2 January 2003, Mr. Coley filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in federal district court.  (Docket # 23).  On 28 February 2003, Respondent Margaret Bagley filed a return of writ.  (Docket # 28).  Mr. Coley then filed his traverse.  (Docket # 58).

A federal court's review of a habeas corpus petition is very different from a state court's review on direct appeal.  The Antiterrorism and Effective Death Penalty Act of 1996 limits a federal district court's ability to grant a writ of habeas corpus where a state court considered the federal claim on the merits.  When a federal court examines a state court's legal decision, the question is not whether the state court's decision was incorrect, but whether the decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).  It is not enough that a federal court disagrees with a state court decision; to grant a petition for a writ of habeas corpus, the federal

2

court must find that the state court's decision was objectively unreasonable.  (Terry)
Williams v. Taylor, 529 U.S. 362, 410 (2000).  In order to assess the reasonableness of
a state court decision, a federal district court must examine the entire state court record
for itself.

For the reasons discussed below, upon full review of the record, this Court will
deny Mr. Coley's petition for a writ of habeas corpus.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**A.**     **The Murder and Trial**

**1.   Facts of the crime**

The Supreme Court of Ohio began its opinion on direct appeal with a statement
of facts.  State v. Coley, 93 Ohio St.3d 253 (2001).  Upon independent review of the
facts, this Court is satisfied with the Statement of Facts issued by the Ohio Supreme
Court.  This statement of facts is set forth below.

Facts
Offenses Against David Moore

On December 23, 1996, around 7:30 p.m., David Moore parked his light
blue, four-door Ford Taurus at his residence in Toledo. While Moore was
unloading his car trunk, a man he later identified as Green asked for
directions. As he gave directions, another man appeared, whom Moore
later identified as Coley. Moore started to leave, but Green and Coley
stood in front of him and displayed small-caliber, shiny, semiautomatic
pistols. Coley then told Moore, "Give me your keys." Moore complied, and
Coley told Moore, "Get in the car." Coley then climbed in behind the
wheel, Green got in back behind Moore, and Coley drove the Taurus
towards the art museum.

3

While in the car, Moore asked them to let him go, but neither Green nor Coley responded. Green did tell Moore to "cough up the cash," and Moore handed Coley $112, which Coley threw on the front seat. Moore noted that Coley was calm and never appeared excited, aggravated, confused, or unsure of himself. After approximately fifteen minutes, Coley pulled into a dark, isolated field and told Moore to get out of the car.

As Moore backed out of the car, Coley shot him in the stomach. After Moore ran away, he heard a car door open and the car wheels spinning, "trying to get out of the mud." Moore heard somebody chasing him. Other shots were fired, and Moore fell down. Then Moore heard another shot and felt a bullet hit him in the head. He pretended that he was dead, but as his assailant walked away, Moore looked back and thought that Green, who was heavier and taller than Coley, was the one who had just shot him.

Eventually, Moore struggled to his feet, went to a nearby house, and summoned assistance. Police and a medical team responded and took Moore to a hospital. Moore had been shot in the head, stomach, and arms, and twice in the hand. During one operation, a surgeon removed a .25 caliber bullet from Moore's wrist.

In addition to the bullet from Moore's wrist, police found two .25 caliber shell casings on Green Street near where Moore had been shot. Evidence established that a gun identified as Coley's gun had ejected the shell casings found on Green Street and fired the bullet removed from Moore's wrist.

On an evening shortly before Christmas 1996, Tyrone Armstrong, a cousin of both Coley and Green, saw Coley and Green driving a light blue, four-door Ford Taurus. The Taurus, which Armstrong knew did not belong to either of them, was overheating, so Armstrong helped put water in the car. Before his abduction, Moore had purchased but not installed a new replacement radiator because his Taurus tended to overheat.

That same evening, Armstrong saw Coley and Green with the same .25 caliber semiautomatic pistols that Armstrong had seen each of them previously carry. Armstrong identified State Exhibit 32, a brown-handled pistol with gray duct tape, as the weapon Coley had previously carried, and State Exhibit 33, which had a pearl handle, as Green's pistol. That evening, Green made up a rap song with the words "I shot him five times and he had dropped." At one point, Green pointed his gun at Coley and said, "You better never snitch on me." Coley mimicked the action; pointing his gun at Green, and repeating, "Better never snitch on me." Penne

4

Graves, Coley's girlfriend, also recognized State Exhibit 32 as a gun she had seen around her house.

After a few days, Coley and Green abandoned Moore's Taurus. On December 27, 1996, police recovered Moore's car in an area near the residence of a girlfriend of Coley. When police found the Taurus, it bore plates that had been stolen from a Mercury Topaz.

## Murder of Samar El-Okdi

Samar El-Okdi was found dead in an alley on January 7, 1997. She had last been seen on January 3, 1997. The police traced El-Okdi's movements on Friday, January 3, 1997, from around 5:00 p.m. until 8:00 p.m., but no evidence firmly established exactly where or when she had been abducted. Sometime after 5:00 p.m. that day, El-Okdi left work and told coworkers that she planned to spend the evening at home. She drove her Pontiac 6000 to her apartment, a block from Moore's residence. Raymond Sunderman, her landlord, saw El-Okdi arrive home sometime between 5:00 and 5:30 p.m. El-Okdi's brother, Samir El-Okdi, recalls that El-Okdi stopped by late that afternoon at the family-owned convenience store for thirty to forty-five minutes. Around 8:00 p.m., El-Okdi dropped film off at the Blue Ribbon Photo store at Westgate Shopping Center.

That same Friday, around 8:45 p.m., Rosie Frusher left a friend's house at West Grove Place, near the Toledo Art Museum, to use a pay telephone. As Frusher walked outside the house at which she was staying, she heard two gunshots. After she had passed by the house, she saw a car to her left in an alley. The car had "long taillights" (similar to those on a Pontiac 6000) and a license plate number with a zero (unlike El-Okdi's license number). Frusher saw a black, stocky "man outside the car bending over that had bushy hair." Another man was sitting in the driver's seat. Then Frusher walked to the pay phone and talked to her friend for thirty minutes or so, but she did not return the same way she had come earlier. Ameritech records establish that Frusher made this call at 8:41 p.m.

On Saturday, January 4, Christopher Neal, El-Okdi's boyfriend, discovered that El-Okdi was missing and notified police. El-Okdi's friends and relatives searched for El-Okdi, hired a private detective, and distributed missing-person flyers. These flyers described El-Okdi, included her photograph, described her car, including the bumper stickers, and listed her last known whereabouts.

That same weekend in Toledo, Armstrong saw Coley driving a gray Pontiac 6000 that he later identified as El-Okdi's car. On the night his cousins were arrested, Armstrong bought some cigars and two bottles of

5

Alize (an alcoholic beverage) for Green and Coley, which police later found in that Pontiac. Armstrong admitted that Green and Coley had keys and used those keys to drive both the Taurus and the Pontiac.

Later that night, Monday, January 6, Megan Mattimoe, El-Okdi's friend and coworker, was parked on Scottwood waiting for another friend to distribute the missing-person flyers about El-Okdi. Around 11:15 p.m., Mattimoe saw El-Okdi's car drive by, which she identified by its dented rear fender and a distinctive bumper sticker, although the license plate was different. While following the Pontiac, Mattimoe used a cellphone to call a friend, who in turn called the police. Mattimoe followed the Pontiac until the driver parked at an apartment complex and two men got out.

After talking with police, Mattimoe and a Toledo detective returned to where the stolen Pontiac was parked. It bore an Ohio license plate, number YRT 022, which had been stolen from another Pontiac 6000 some time before 6:00 p.m. on January 4, 1997. Police staked out the car, using five undercover police vehicles.

After midnight, Green, Coley, and a woman with a baby got into the Pontiac and drove away. Police followed in undercover vehicles and, assisted by marked police cars, forced the Pontiac to stop. Despite being surrounded, Green rammed one car and spun his wheels in an effort to escape. Green and Coley also resisted arrest, and police forcibly removed each of them from the car. Police found a loaded pistol in Green's coat. When one policeman approached the car, he noticed that Coley, who was sitting in the back seat, had a metallic object in his hand. On the Pontiac's rear floor, police found a loaded, .25 caliber, brown-handled pistol (Exhibit 32) near where Coley had been sitting.

Inside the trunk, police found a black crochet purse that El-Okdi had with her on January 3 when she disappeared. However, police never found her red wallet and credit cards, which she always carried with her inside the black purse. Police found one of El-Okdi's license plates underneath the stolen rear plate, and they found her other license plate in the car trunk.

On the afternoon of January 7, police found El-Okdi's body in an alley behind West Grove Place, where Frusher had heard shots and had seen two men in a car four days earlier. El-Okdi was wearing the same white shirt, black shoes, and black trousers that she wore to work on January 3. At the scene, police found a live .25 caliber bullet and a .25 caliber shell casing near El-Okdi's body.

The deputy coroner found that El-Okdi had died from a .25 caliber bullet, which the deputy coroner removed from the back of her cerebellum. The

6

bullet had struck her between the eyes and had been fired from a muzzle distance of approximately twelve to eighteen inches. The deputy coroner concluded that El-Okdi did not die immediately.

David Cogan, a firearms expert, examined the .25 caliber bullet removed from El-Okdi's brain, the .25 caliber bullet removed from Moore's wrist, three .25 caliber shell casings from the two crime scenes, and Coley's .25 caliber semiautomatic pistol recovered from the rear floor of El-Okdi's Pontiac. Cogan concluded that Coley's pistol was in operating condition and had fired the bullets into Moore and El-Okdi and had ejected the three crime-scene shell casings. After police searched Green's residence on January 7, 1997, they found an empty box that had contained .25 caliber Remington ammunition.

On January 7, 1997, Coley and Green were arraigned on charges relating to El-Okdi's stolen Pontiac and the stolen plates. That arraignment was shown on television, and Moore immediately recognized Green and Coley from the television newscast as the men who had kidnapped, robbed, and shot him.

That same week, Coley, Green and their cousin Armstrong were all in jail, although Armstrong was being held on unrelated charges. While Armstrong and Coley were together, Coley hugged him and told him, "I did it but Joe [Green] shouldn't have snitched on me." By this comment, Armstrong understood Coley to mean that Coley had shot El-Okdi. Coley also asked Armstrong to lie for him by claiming that Coley had obtained his weapon and the Pontiac from someone named Denny.

State v. Coley, 93 Ohio St.3d 253-57 (2001).

## 2.    Pre-trial proceedings

A Lucas County, Ohio grand jury indicted Mr. Coley on 17 January 1997, charging him with seven counts in connection to the offenses against Mr. Moore and Ms. El-Okdi. None of these counts, however, contained a capital indictment. (Docket # 29, at 67-75). On 22 and 24 January 1997, Police Chief Gerald Galvin and Detective Phil Kulkowski expressed their dissatisfaction with the indictment in the local newspaper, the Toledo Blade. On 10 March 1997, Mr. Coley was re-indicted for the

7

offenses against Mr. Moore and Ms. El-Okdi and charged with a capital specification for the aggravated murder of Ms. El-Okdi. Id. at 76.

The trial court thereafter appointed Jeffrey J. Helmick and John B. Thebes to represent Mr. Coley. Counsel filed numerous pre-trial motions, two of which are relevant to the claims raised in the Petition. First, counsel filed a motion for disclosure of grand jury testimony. Id. at 106. In this motion, counsel alleged that the re-indictments with a capital specification were a direct result of the Blade publications and, consequently, counsel were entitled to review the grand jury transcript proceedings that led to the re-indictments. Counsel also moved the court to separate the counts concerning Mr. Moore from those involving Ms. El-Okdi. (Docket # 30, at 1). On 15 July 1997, the trial court held a hearing on both motions and subsequently denied them.

The court-appointed defense investigator thereafter discovered the existence of a threatening letter that Mr. Coley allegedly authored and sent to his cousin. The investigator delivered the letter to defense attorney Helmick. Mr. Helmick recognized the ethical dilemma in which he was placed and contacted the Supreme Court of Ohio Board of Commissioners on grievances and discipline for advice. The Board advised Mr. Helmick to disclose the contents of the letter to the trial judge, Ruth Ann Franks. Judge Franks then contacted the police and prosecutor's office, which began an investigation. Although defense counsel had moved to quash the prosecutor's subpoenas to obtain the letter, the trial judge overruled the motion and required them to furnish the letter to law enforcement. Defense counsel filed a motion to withdraw as counsel, which the trial judge granted. It then appointed Adrien Cimerman and Merle Deck to represent Mr. Coley during trial.

8

Mr. Coley's co-defendant, Joseph Green, plead guilty to seven of eleven counts in the indictment.  On 9 March 1998, a three-judge panel convicted Mr. Green of the remaining four counts and sentenced him to death.  The Supreme Court of Ohio reversed the death sentence on appeal.  State v. Green, 90 Ohio St.3d 352 (2000).

Jury selection commenced in Mr. Coley's trial on 1 May 1998.  The State exercised a peremptory challenge for Juror 303, who was a Jamaican-American.  Defense counsel objected to this action, asserting that the State was excluding this juror based on her presumed race.  The trial court held a hearing on this issue but found that the State articulated several race-neutral reasons for excluding the prospective juror.  The trial court also excluded from jury service several venire members who stated that they could never impose the death penalty.

### 3.    Culpability Phase of Trial

The culpability phase of the trial began on 14 May 1998.  David Moore was the first to testify for the State.  During this testimony, he recounted the events of his abduction and attempted murder.  He relayed that two men, who he identified as Mr. Coley and Mr. Green, approached him and asked him for directions.  Soon after, the men forced Mr. Moore into his car at gunpoint.  Fearing that his death was imminent, Mr. Moore silently recited the "Act of Contrition" to exact forgiveness from God for any sins he committed.  He then attempted to secure his freedom by stating to Mr. Coley and Mr. Green that "they didn't have to do this" and that they could simply obtain his money, drop him off, and that he would not report their crimes to the police.  (Docket # 41, at 1345).  Although the two men asked for, and Mr. Moore relinquished, his money and other valuables, they appeared uninterested in it.

9

Mr. Coley, who was driving Mr. Moore's vehicle, turned into an isolated field and stopped the vehicle. Mr. Moore testified that Mr. Coley shot him in the stomach as Mr. Moore was exiting the vehicle. Still ambulatory, Mr. Moore attempted to run. Mr. Coley or Mr. Green pursued Mr. Moore, shooting him in the arm and causing him to fall to the ground. Mr. Moore stated that he heard his assailant standing over him and heard the gun fire. He felt a bullet hit him in the head. Amazed that he was still conscious, he pretended he was dead. Mr. Moore testified that he believed that it was Mr. Green who shot him in the head.

The State next adduced testimony from several witnesses regarding the events leading up to Ms. El-Okdi's kidnapping and murder. Megan Mattimoe testified that she observed Ms. El-Okdi's automobile driving on a Toledo street and followed the vehicle. She eventually contacted police and described to them where the vehicle was located. Various members of Toledo law enforcement also testified about the investigation of Ms. El-Okdi's murder.

The defense called Toledo Police Sergeant Robert Maxwell, who testified that when executing a search warrant of Mr. Green's residence, he found several boxes of live ammunition and weapons. Defense counsel then called Colonel Brewster, Mr. Coley's brother to testify. Although he testified that Mr. Green and Tyrone Armstrong, Mr. Green's cousin, came to his house in a blue Ford Taurus and Pontiac 6000, much of the testimony that Mr. Brewster apparently wished to provide was deemed to be inadmissible hearsay by the trial court. Upon the conclusion of Mr. Brewster's testimony, defense counsel had a sidebar conference with the trial judge. At that time, defense counsel stated that they had determined that the testimony Mr.

10

Brewster intended to provide was false.  Thereafter, the defense rested.  The jury convicted Mr. Coley on all charges on 19 May 1998.

### 4.    Penalty Phase of Trial

The mitigation phase of the trial began on 20 May 1998.  In its independent evaluation of the evidence, the Supreme Court of Ohio summarized the defense's case during the mitigation hearing.  The Court repeats relevant portions of that summary here:

#### A. Penalty-Phase Evidence

Several of Coley's relatives testified for the defense, including Karen Armstrong, the sister of Coley's mother; Douglas Bell, Coley's father; and Willie Austin and Martha Davis, Bell's sisters and Coley's aunts. Additionally, Dr. Wayne Graves, a clinical psychologist, testified concerning Coley's mother, Victoria Coley. The testimony of these witnesses and the extensive documentary evidence confirming their testimony establishes that Coley's upbringing can be described as a chaotic nightmare.

Victoria Coley, Coley's mother, was one of nine sisters. Victoria Coley was hospitalized in state mental hospitals some fifteen times between 1977 (when Coley was two years old) to 1991. Victoria also had extensive outpatient treatment when she was not institutionalized. Victoria, who had an IQ in the 65-68 range, was a chronic paranoid schizophrenic. She also suffered from mixed substance abuse and borderline personality disorders. When out of institutions, Victoria used street drugs, drank heavily, and engaged in prostitution to obtain money for drugs. In 1989, Victoria was found not guilty by reason of insanity for the aggravated arson of her home that endangered her children.

Her sister-in-law, Martha Jean Davis, described Victoria as an "oversexed mental patient * * * [who] wouldn't keep her clothes on." She "would strip and run down * * * the street with no clothes on. * * * [S]he would have sex with anyone, anybody, anywhere * * *." Victoria had sex with Davis's ten-year-old son, and reportedly had sex with her own children. When Victoria was institutionalized, her children stayed with relatives. However, Coley and his older brother, Victor, were neglected and malnourished, whether they were with Victoria or relatives. In referring to both Victoria's family and Bell's family, Davis characterized them as "all alcoholics and drug addicts." Children's Service Bureau and other social service records concerning Victoria and her family date from 1975 and document the family's horrific problems and neglect of the children, including Coley.

11

Douglas Bell, Coley's father, was not a positive father figure. Bell went to prison for five years when Coley was just a few months old. Bell lived with Victoria at various times, but Bell agreed that he has served about six or seven prison terms and had been convicted of burglary, robbery, felonious assault, drug trafficking, and other offenses. After Coley was born, Bell was usually in prison or involved with drugs.

Karen Armstrong, Coley's aunt, testified that Victoria's life went downhill after she became involved with Bell and his family because she used drugs more frequently and engaged in prostitution.

Willie Louise Austin, Bell's sister, stated that her entire family of six brothers and four sisters was not stable. Austin testified that she had been a prostitute and drug addict and that everyone in the family had been drug addicts or alcoholics at some point. The children (Coley and Victor) were forced to fend for themselves, which is "where the panhandling and stealing and selling dope comes in."

Marquita Armstrong, Victoria's sister, testified for the state and identified a letter Coley had written to her acknowledging that he had been taught the difference between right and wrong. Coley stayed with Marquita at times in his childhood and attended church when he did. Marquita admitted that her boyfriend sold drugs when Coley lived with her. She also agreed that she had shot her boyfriend but "[n]ot for selling drugs."

State v. Coley, 93 Ohio St.3d at 272.  Upon conclusion of the presentation of evidence, the jury deliberated and found that the aggravating circumstances outweighed the mitigating factors.  It recommended that Mr. Coley be sentenced to death on 21 May 1998.  The trial court accepted the jury's recommendation and, in a written opinion required by Ohio Revised Code § 2929.03(F), sentenced Mr. Coley to death on 8 June 1998.

**B.**     **Direct Appeal**

Mr. Coley filed a notice of appeal in the Supreme Court of Ohio on 23 July 1998.[1]

(Docket # 34, at 3).  Attorneys Joseph A. Benavidez and James W. VanDeilen

---

[1]     For offense committed on or after January 1, 1995, a death-sentenced individual appeals directly to the Supreme Court of Ohio.  See Ohio S. Ct. Prac. R. II(C)(1).

12

represented Mr. Coley on appeal.   Mr. Coley raised the following propositions of law to the Supreme Court of Ohio:

### PROPOSITION OF LAW I

The rights of the accused to a fair trial, to a fair and impartial jury, and to due process are violated when pretrial publicity is so pervasive that prejudice to the accused must be presumed, and when the voir dire of the prospective jurors reinforces the prejudice caused by the publicity.  U.S. Const. Amends. VI, XIV.

### PROPOSITION OF LAW II

A conviction on insufficient evidence of prior calculation and design violates the due process clause.  U.S. Const. Amend. XIV.

### PROPOSITION OF LAW III

The accused's right to due process and to a jury verdict are violated when the trial court's instruction defines an essential element of the crime charged by using the definition of a separate element of that charge.  U.S. Const. Amend. VI, XIV.

### PROPOSITION OF LAW IV

The defendant's rights to double jeopardy and to due process of law are violated when he is punished twice for one indivisible act. U.S. Const. Amends. V, XIV.

### PROPOSITION OF LAW V

The introduction of gruesome photographs with little probative value but which are highly prejudicial violated a capital defendant's right to a fair trial, due process, and a reliable determination of guilt as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and § 9, 10, and 16, Article I of the Ohio Constitution.

### PROPOSITION OF LAW VI

The accused's right to due process is violated when the trial court shifts the burden of proof from the state by instructing the jury to deliberate on the innocence of the accused.  U.S. Const. Amend. V, XIV.

13

PROPOSITION OF LAW VII

A criminal defendant charged with aggravated felony murder under R.C. § 2903.01(B) has a statutory right to a jury instruction under R.C. § 2903.01(E) that any inference of intent to kill from the means and commission of the offense is non-conclusive.  U.S. Const. Amend. XIV.

PROPOSITION OF LAW VIII

The capital defendant's right against cruel and unusual punishment and his right to due process are violated when, the legal issue of relevance is left to the jury regarding sentencing considerations, and, the sentencing proceeding creates an unacceptable risk of arbitrary, nonstatutory aggravators in the weighing process.  U.S. Const. Amend. VIII, XIV.

PROPOSITION OF LAW IX

The accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

PROPOSITION OF LAW X

Ohio's death penalty law is unconstitutional.  The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and § § 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03. 2929.04 and 2929.05, (Anderson 1996), do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Doug Coley.

PROPOSITION OF LAW XI

It is prejudicial error in a capital case to join for trial two separate offenses occurring at different times and places, joinder of unrelated offenses denies a capital defendant the right to a trial and sentencing which is both fair and reliable, in contravention to the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Section 10, Article I of the Ohio Constitution.

14

PROPOSITION OF LAW XII

> The trial court commits prejudicial error when the grand jury transcripts are requested by the defense and the court refuses to disclose them after the defense shows a particularized need, conta [sic] the Fifth, Sixth, and Fourteenth Amendments to the Constitution and Ohio Rule of Criminal Procedure 6E.

(Docket # 34, at 8).

On 3 October 2001, the Supreme Court of Ohio unanimously affirmed Mr. Coley's conviction and sentence of death.  State v. Coley, 93 Ohio St.3d 253 (2001). Although it did not address each of Mr. Coley's propositions of law in detail, it "considered each of the twelve propositions of law." Id. at 257.  For those propositions it addressed in its opinion, the Supreme Court of Ohio specifically concluded that:

- Mr. Coley never moved for a change of venue and thus waived his right to assert a claim on that basis.  Moreover, the trial court individually conducted voir dire of each juror regarding publicity and repeatedly cautioned the jury not to read or listen to media reports.

- The trial court did not err when it joined the charges involving Mr. Moore and Ms. El-Okdi pursuant to Ohio Rule of Evidence 404(B) to prove Mr. Coley's identity in Ms. El-Okdi's murder.

- The trial court did not err in denying Mr. Coley's motion to unseal the second grand jury transcripts because Mr. Coley did not demonstrate a particularized need for the transcripts.  Moreover, the second indictment was based on the additional investigation and new evidence, not on improper motives such as placating the police department.

- There was sufficient evidence of prior calculation and design to convict Mr. Coley of aggravated murder and of felony-murder.

- Mr. Coley was sentenced to only one death sentence.  Thus, his right against double jeopardy was not violated.

- The trial court's jury instructions were not erroneous.

15

93 Ohio St.3d at 258-270.  In addition, the Supreme Court of Ohio independently determined that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.  In comparison with other felony-murder cases involving kidnapping, it also concluded that the death sentence was neither excessive nor disproportionate.  Id. at 273.

Mr. Coley filed a motion for stay of execution pending the exhaustion of his state court remedies.  (Docket #34, at 488).  The Supreme Court of Ohio granted the motion on 12 December 2001.  Id. at 492.

## C.     Post-conviction Relief Proceedings

### 1.     Post-conviction relief

On 18 August 1998, Mr. Coley filed a pro se motion for appointment of counsel to file a post-conviction relief petition.  The trial court granted Mr. Coley 's motion on 28 September 1998.  No post-conviction petition was filed on Mr. Coley's behalf, however, prior to the expiration of the time period set forth in the Ohio Revised Code.[2]

Upon learning that court-appointed counsel had not filed a petition for post-conviction relief, Mr. Coley contacted the Ohio Public Defender's Office ("OPD") to

_____

[2]      That statute states in relevant part:
>      A petition . . . shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeal in the direct appeal . . .  or, if the direct appeal involves a sentence of death, the date on which the trial transcript is filed in the supreme court.

Ohio Rev. Code § 2953.21(A)(2).

16

request legal assistance.  The OPD responded that it could not represent Mr. Coley because of a conflict of interest.[3]

### 2.    Application to Re-Open Direct Appeal[4]

On 31 December 2001, Mr. Coley's volunteer counsel, Keith Yeazel, filed an application to re-open Mr. Coley's direct appeal.  In this application, counsel asserted that, had counsel provided Mr. Coley with effective assistance on direct appeal, they would have raised the following additional propositions of law to the Supreme Court of Ohio:

> PROPOSITION OF LAW XIII[5]
>
> A death sentence must be vacated where the sentencing court did not weigh the existence of any mitigating factors against the felony-murder aggravating circumstance the offender was found guilty of committing in accordance with R.C. § 2929.03(D)(3).
>
> PROPOSITION OF LAW XIV
>
> When a trial judge has some extra-judicial basis for rendering a biased judgment, her actual motivations are hidden from review, and a reviewing court must presume that the outcome of the trial is unreliable.
>
> PROPOSITION OF LAW XV

---

[3]    The OPD had successfully represented Mr. Coley's co-defendant, Joseph Green, on direct appeal.

[4]    Under Ohio law, a claim of ineffective assistance of appellate counsel may be brought before the Ohio court of appeals or Supreme Court of Ohio by way of an application to reopen the direct appeal ("application to reopen" or "Murnahan application").  See State v. Murnahan, 63 Ohio St. 3d 60 (1992).

[5]    The numbering of the claims presented in the application to reopen represents a continuation of the claims as presented in Mr. Coley's direct appeal.

17

The imposition of the death penalty is precluded under the Due Process Clause of the Fourteenth Amendment when the conviction of appellant as the principal offender in the El-Okdi murder was (1) based on insufficient evidence and (2) against the manifest weight of the evidence.

## PROPOSITION OF LAW XVI

It is an affront to the Due Process Clause of the Fourteenth Amendment to the United States Constitution and subverts the truth-seeking function of a criminal trial when the prosecution pursues inconsistent theories in separate trials of defendants charged with the same murder.

## PROPOSITION OF LAW XVII

It is plain error and a violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution for a trial judge to instruct the jury in an aggravated murder case to find that a defendant committed a purposeful killing, regardless of what the defendant intended if he engaged in prohibited conduct.

## PROPOSITION OF LAW XVIII

It is plain error and a violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution for a trial judge to give an aider and abettor jury instruction that permits the jury to find that the defendant had the specific intent to cause the death of El-Okdi from the fact that the defendant acted in concert with another.

## PROPOSITION OF LAW XIX

A conviction of aggravated murder, where the murder occurred prior to June 20, 1998, is void unless the indictment contained an averment that the defendant specifically intended to cause the death of another.

## PROPOSITION OF LAW XX

Multiple instances of deficient performance in the conduct of the eligibility [sic] and penalty phases of a capital trial coupled with prejudice inuring to the detriment of the defendant constitute ineffective assistance of counsel under the Fourteenth Amendment to the United States Constitution.

18

PROPOSITION OF LAW XXI

Appellate counsel's failure to review sealed portions of the record constitutes ineffective assistance and until those portions of the record are unsealed and reviewed by competent counsel for purposes of appellate review, prejudice inuring to the detriment of the defendant should be presumed.

(Docket # 35, at 1-8).  In a summary entry, the Supreme Court of Ohio denied Mr. Coley's application to reopen his direct appeal on 4 March 2002. Id. at 490.

## D.     Federal Petition for Writ of Habeas Corpus

On 8 March 2002, Mr. Coley filed, in federal court, a notice of intention to file a habeas corpus petition, a motion for appointment of counsel, and a motion to proceed in forma pauperis.  (Docket # 1, # 2, and # 4).  On 16 May 2002, this Court granted Mr. Coley's application for leave to proceed in forma pauperis and appointed attorneys John B. Gibbons and Kevin M. Cafferkey to represent him.  (Docket # 7 and # 8).  Mr. Coley filed his initial petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Docket # 23).  Thereafter, the Respondent filed the return of writ.  (Docket # 28).

### 1.     Motion for Discovery

On 24 February 2003, Mr. Coley filed a motion to conduct discovery.  In this motion, Mr. Coley requested that the Court permit him to obtain the threatening letter that he allegedly authored and that was discovered prior to trial.  The discovery was relevant to his claim in which he asserts that, because the trial judge viewed this letter, she should have recused herself from presiding over Mr. Coley's trial.  The Respondent opposed Mr. Coley's motion, (Docket # 51), arguing that this issue already was fully addressed by the trial court.  Finding that Mr. Coley failed to state how the letter he

19

sought related to any claims raised in the petition or to explain why he could not simply obtain this letter from prior counsel, the Court denied the motion.  (Docket # 57).

On 11 June 2003, Mr. Coley filed a motion for reconsideration of the Court's order denying his motion for discovery, (Docket # 60), which the State opposed. (Docket # 61).  He asserted that the letter pertained to his ineffective assistance of trial and appellate counsel claims.  Additionally, Mr. Coley explained that, because prior counsel testified during a grand jury hearing regarding the letter, they were unable to furnish it to habeas counsel without a court order.  Holding that Mr. Coley had satisfied its prior concerns regarding the necessity and relevance of the requested discovery, the Court granted Mr. Coley's motion for reconsideration.  (Docket # 67).

### 2.   Motions to Amend the Petition

On 25 October 2004, Mr. Coley moved the Court for permission to further brief evidentiary issues.  (Docket # 71).  Specifically, Mr. Coley claimed that because he had obtained a copy of the threatening letter, he wished to amend the petition to include allegations pertaining to its effect on the trial court's handling of the case.  The Court granted the motion and allowed Mr. Coley to amend the sixth ground for relief raised in the petition.  (Docket # 72).  Mr. Coley thereafter filed an amended petition. (Docket #74).

On 3 December 2004, Mr. Coley again moved the Court to amend his petition. He requested permission to amend other claims for relief raised in the petition that were relevant to the letter obtained in discovery.  Concurrent with that motion, Mr. Coley filed a motion to seal all exhibits and attachments to his amended petition.  (Docket # 75). The Respondent opposed Mr. Coley's motion to amend his petition and filed a

response to his motion to seal the record. (Docket # 76, 77). On 23 December 2004, the Court granted both motions. (Docket # 79). Furthermore, it required Mr. Coley to combine his initial petition with the addendum. Mr. Coley filed a second amended petition on 18 January 2005. (Docket # 81). The State filed its second amended return of writ on 21 January 2005. (Docket # 82). Mr. Coley thereafter sought and obtained leave to file a second amended traverse, which he filed on 17 May 2005. (Docket # 84). The Respondent then sought and obtained leave to file an amended sur-reply, which she filed on 20 May 2005. (Docket # 86).

### 3. Claims for Relief

In the second amended petition for a writ of habeas corpus, Mr. Coley presents the following grounds for relief:

> FIRST GROUND FOR RELIEF
>
> > When possible juror misconduct is brought to the trial judge's attention he [or she] has a duty to investigate and determine whether there may have been a violation of the Sixth Amendment.
>
> SECOND GROUND FOR RELIEF
>
> > The excusal of jurors merely [because they are] opposed to the death penalty violates the standards set forth in Adams v. Texas, 448 U.S. 38 (1980) and Wainwright v. Witt, 469 U.S. 412 (1985).
>
> THIRD GROUND FOR RELIEF
>
> > Petitioner was denied a fair trial and his rights to due process and equal protection of law in violation of the Sixth Amendment to the United States Constitution as the State's use of its peremptory challenge to excuse the sole African-American panel member from the jury panel.

21

FOURTH GROUND FOR RELIEF

The judgment and sentence against Petitioner Coley are void or voidable because he was denied the effective assistance of counsel in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

FIFTH GROUND FOR RELIEF

Petitioner Coley's convictions and sentences are void or voidable because he was denied his right to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because of prosecutorial misconduct at both the guilt/innocence and mitigation phases of his capital trial.

SIXTH GROUND FOR RELIEF

Petitioner's conviction and/or sentence are void or voidable because the trial judge was unaware of the appropriate legal standards.

SEVENTH GROUND FOR RELIEF

Petitioner Coley's conviction and sentence are void and/or voidable because the State introduced inflammatory and gruesome photographs during his capital trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

EIGHTH GROUND FOR RELIEF

Petitioner Coley's conviction and/or sentence are void or voidable because the court failed to maintain a complete record of all proceedings.

NINTH GROUND FOR RELIEF

Petitioner Coley's convictions and sentences are void or voidable because of the cumulative effects of the errors which occurred at his capital trial.

22

TENTH GROUND FOR RELIEF

Petitioner Coley was denied the effective assistance of
counsel at the mitigation phase of his capital trial.

ELEVENTH GROUND FOR RELIEF

The Petitioner's convictions and sentences are void and/or
voidable because he did not receive the effective assistance
of counsel on his direct appeal.

TWELFTH GROUND FOR RELIEF

The judgments and sentences against Petitioner Coley are
void or voidable because his death sentence is unreliable
and inappropriate in violation of his rights guaranteed by the
Fifth, Sixth, Eighth and Fourteenth Amendments to the
United States Constitution.

THIRTEENTH GROUND FOR RELIEF

Petitioner Coley's convictions and sentences are void and/or
voidable because his death sentence is unreliable and
inappropriate in violation of his rights as guaranteed by the
Fifth, Sixth, Eighth and Fourteenth Amendments to the
United States Constitution.

FOURTEENTH GROUND FOR RELIEF

Petitioner Coley was denied his right to a fair trial in violation
of the Fifth, Sixth, Eighth and Fourteenth Amendments to
the United States Constitution because the trial judge gave
improper instructions on considerations of sympathy,
improper instructions on principal offender, improper
instructions on prior calculation and design, improper
instructions on aider and abettor, and improper instructions
on reasonable doubt.

FIFTEENTH GROUND FOR RELIEF

The judgment and sentence against Coley are void or
voidable because the proportionality review required by Ohio
Revised Code § 2929.05 does not meet the requirement of
Due Process as mandated by the Fifth, Sixth, Eighth and
Fourteenth Amendments to the United States Constitution.

23

### SIXTEENTH GROUND FOR RELIEF

The Petitioner was denied his right to due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the Ohio Supreme Court applied the improper standards of review in denying relief for federal constitutional violations.

### SEVENTEENTH GROUND FOR RELIEF

Ohio's post-conviction relief procedures are a meaningless ritual in the case of Douglas L. Coley.

### EIGHTEENTH GROUND FOR RELIEF

Ohio's death penalty statutes are unconstitutional.

### NINETEENTH GROUND FOR RELIEF

Petitioner's conviction and sentence are void or voidable because the Ohio capital punishment statutes require imposition of the death penalty if the aggravating circumstances outweigh the mitigating factors by even the slightest amount.

### TWENTIETH GROUND FOR RELIEF

The Ohio death penalty statutes improperly shift the burden of proof to the defendant.

### TWENTY-FIRST GROUND FOR RELIEF

The Ohio death penalty statutes fail to narrow the class of individuals eligible for imposition of the death penalty.

(Docket # 81, passim).

24

## II.  LAW AND ANALYSIS

### A.      The Applicability of AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

which amended 28 U.S.C. § 2254, was signed into law on 24 April 1996.  In Lindh v.

Murphy, 521 U.S. 320, 322-322, 336 (1997), the Supreme Court of the United States

held that the provisions of the AEDPA apply to habeas corpus petitions filed after that

effective date.  See also Woodford v. Garceau, 538 U.S. 202, 210 (2003); Barker v.

Yukins, 199 F.3d 867, 871 (6th Cir. 1999)("It is now well settled that AEDPA applies to

all habeas petitions filed on or after its April 24, 1996 effective date.")  As Mr. Coley's

initial petition was filed on 2 January 2003, the AEDPA governs this Court's

consideration of his petition.

### B.      AEDPA Standard of Review

The AEDPA was enacted "to reduce delays in the execution of state and federal

criminal sentences, particularly in capital cases, and 'to further the principles of comity,

finality, and federalism.'" Woodford, 538 U.S. at 206 (citing Williams v. Taylor, 529 U.S.

362, 436 (2000)).  The requirements of the AEDPA "create an independent, high

standard to be met before a federal court may issue a writ of habeas corpus to set

aside state-court rulings." Uttecht v. Brown, 551 U.S. 1, 10 (2007)(citations omitted).

Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim --

25

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's statement and/or application of federal law and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  Williams, 529 U.S. at 412; Barnes v. Elo, 231 F.3d 1025, 1028 (6th Cir. 2000).[6]  The "contrary to" and "unreasonable application" clauses of the Section 2254(d)(1) are independent tests and must be analyzed separately.  Williams, 529 U.S. at 412-13; Hill, 337 F.3d at 711.   A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id. at 412-13.

---

[6]  Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."  Hill v. Hofbauer, 337 F.3d 706, 716 (6th Cir. 2003).

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." Williams, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a context where it should apply.  Id. at 407; Hill, 337 F.3d at 711.  As the Supreme Court recently advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007)(citing Williams, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  Id.

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court had the opportunity to apply the "fact" part of Section 2254(d)(2) in Wiggins v. Smith, 539 U.S. 510 (2003).  In that case, the Court noted that a "clear factual error" such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant constitutes an "unreasonable determination of the facts in light of the evidence presented."  Id. at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.

27

This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003); Clark v. O'Dea, 257 F.3d 498, 506 (6th Cir. 2001)("regardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary"). This presumption only applies to basic, primary facts, and not to mixed questions of law and fact. Mitchell, 325 F.3d at 737-38 (ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were adjudicated on the merits in the state court proceeding. Clinkscale v. Carter, 375 F.3d 430, 436 (6th Cir. 2004). When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply. Id.; Newton v. Million, 349 F.3d 873, 878 (6th Cir. 2003). In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a de novo review of the claim. Benge v. Johnson, 312 F. Supp. 2d 978, 987 (S.D. Ohio 2004).[7] If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law,

---

[7] To the extent that the state court did not address a claim due to petitioner's failure to raise it on direct review, the claim may have been procedurally defaulted. O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Maples v. Stegall, 340 F.3d 433, 437-38 (6th Cir. 2003).

28

however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal law." Maldonado v. Wilson, 416 F.3d 470, 476 (6th Cir. 2005)(citing Harris v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000)).

In addition to reciting the standard the Court will employ in this case, the Court is compelled to address the arguments raised in the Amended Traverse on the standard of review.  Mr. Coley argues that, to the extent the AEDPA attaches new legal consequences to the outcome of his petition, it is unconstitutionally retroactive.  Thus, Mr. Coley claims, the AEDPA's alteration of the existing habeas corpus statutes must be subjected to a retroactivity analysis pursuant to Landgraf v. USI Film Prod., 511 U.S. 244 (1994).

The Court will not undertake a Landgraf retroactivity analysis because Barker v. Yukins, 199 F.3d 867 (6th Cir. 1999), cert. denied, 530 U.S. 1229 (2000), dispenses with this issue.  In that case, the petitioner's appeals were completed prior to the AEDPA's passage and the petitioner claimed applying the AEDPA amendments to her case would result in an unconstitutional, retroactive application of new legislation to her case.  Id. at 871.  The Sixth Circuit disagreed, and, citing Lindh v. Murphy, 521 U.S. 320, 336 (1997), determined that "the fact that [petitioner's] state criminal appeals were completed prior to the effective date of the AEDPA is of absolutely no consequence in ascertaining whether the AEDPA is or is not applicable."  Id.  Instead, the court opined, the date on which the petitioner filed her petition for habeas relief is determinative.  Accordingly, Mr. Coley's retroactivity argument must fail.

29

C.     **Prerequisites to Section 2254 Habeas Relief**

Federal habeas petitioners face several threshold hurdles in their pursuit of relief under Section 2254. Specifically, they must exhaust their state remedies and satisfy or be excused from the one-year statute of limitations. See 28 U.S.C. §§ 2244(d)(1) and 2254(b) and (c). In this case, the State concedes that Mr. Coley has exhausted available state court remedies. (Docket # 82, at 21).

The statute of limitations set forth in Section 2244(d)(1) is an affirmative defense not a jurisdictional prerequisite. Scott v. Collins, 286 F.3d 923, 927 (6th Cir. 2002). The party asserting the statute as a defense bears the burden of demonstrating that the statute has run. Griffin v. Rogers, 308 F.3d 647, 653 (6th Cir. 2002). A party's failure to raise the statute of limitations defense in the first responsive pleading waives the defense. Scott, 286 F.3d at 927-28. Since the State has never raised a statute of limitations defense, this Court need not consider this issue any further.

D.     **Procedural Default**

Before examining the merits of Mr. Coley's claims, the Court must address the State's contention that most of his grounds for relief are procedurally defaulted and therefore barred from federal habeas corpus review.

1.     **General Law of Procedural Default**

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." Wainwright v. Sykes, 433 U.S. 72, 87 (1977). If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is

30

barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." Fautenberry v. Mitchell, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)(citing Coleman, 501 U.S. at 732-733).  To be adequate, a state procedural rule must be "firmly established and regularly followed" by the state courts at the time it was applied.  Ford v. Georgia, 498 U.S. 411, 423-24 (1991); Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001).  If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims.  O'Sullivan, 526 U.S. at 848; Rust v. Zent, 17 F.3d at 160.

In Maupin v. Smith, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the analysis to be followed when the State argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

31

Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001)(*citing* Maupin, 785 F.2d at 138)(further citations omitted).

In determining whether the Maupin factors are met, the federal court looks to the last explained state court judgment. Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991); Combs v. Coyle, 205 F.3d 269, 275 (6th Cir. 2000). If the last reasoned opinion on a claim explicitly imposed a procedural default, there is a presumption, which can be rebutted with strong evidence to the contrary, "that a later decision rejecting the claim did not silently disregard the bar and consider the merits." Ylst, 501 U.S. at 803. "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review." Id. at 801.

If the three Maupin factors are met, the claim is procedurally defaulted. However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or (2) a fundamental miscarriage of justice would result from a bar on federal review. Maupin, 785 F.2d at 138; Hutchison v. Bell, 303 F.3d 720, 735 (6th Cir. 2002); Combs, 205 F.3d at 274-275.

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986); Mohn v. Bock, 208 F. Supp.2d 796, 801 (E.D. Mich. 2002). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Murray, 477 U.S. at 488; Mohn, 208 F. Supp.2d at 801. Second, constitutionally

32

ineffective assistance of counsel constitutes cause.  Murray, 477 U.S. at 488-489; Rust v. Zent, 17 F.3d 155, 161 (6th Cir. 1994); Mohn, 208 F. Supp.2d at 801, 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  Murray v. Carrier, 477 U.S. 478, 488-489 (1986).  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim.  Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995)(quoting United States v. Frady, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."  Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  Dretke v. Haley, 541 U.S. 386, 392 (2004)(citing Murray v. Carrier, 477 U.S. 478, 495-96 (1985)).  When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to

33

cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" Id. (quoting Sawyer v. Whitley, 505 U.S. 333, 336 (1992)).

**2.      Specific Grounds for Relief Involving Procedural Default**

**a.      Grounds for Relief 1, 2, 3, 6(c),(d),(f), 8, 9, 10(g), 11(b), (c), 12, 14(a), (b),16, 17, 19, 20, 21 – Claims Never Raised in State Court**

The claims enumerated above were never raised in the State courts at any juncture of Mr. Coley's state court proceedings.  A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); Rose v. Lundy, 455 U.S. 509 (1982).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994); Manning v. Alexander, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  Rust, 17 F.3d at 160.

Claims that were never raised at any juncture of the State court proceedings are both unexhausted and procedurally defaulted because the Supreme Court of Ohio has not had an opportunity to decide them.   If a habeas petitioner sought to return to state court and attempted to present new claims to the Supreme Court of Ohio, that court would refuse to hear such claims because the Supreme Court of Ohio requires a direct appeal from the Courts of Common Pleas "within 45 days from the journalization of the

34

entry of the judgment being appealed or the filing of the trial court opinion pursuant to section 2929.03(F) of the Revised Code, whichever is later." S. Ct. Prac. R. XIX, Section 1(A). Thus, a death-sentenced criminal defendant must present his or her appeal directly to the Supreme Court of Ohio or it will not have had a "fair and full opportunity" to review these claims as Rust requires.

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." Buell v. Mitchell, 274 F.3d 337, 349 (6th Cir. 2001) (quoting Coleman v. Mitchell, 244 F.3d 533, 538 (6th Cir. 2001))(internal quotation marks omitted). Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. Lott v. Coyle, 261 F.3d 594, 608 (6th Cir. 2001). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. Buell, 274 F.3d at 349.

Because Mr. Coley has failed to raise the above claims at any juncture of his State court proceedings, the Court finds that these claims are unexhausted and procedurally defaulted. To obtain a merit review of these claims, Mr. Coley must demonstrate cause and prejudice or a miscarriage of justice to excuse the default.

     **b.**     **Grounds for Relief 4(a),(b),(c),(d),(e),(f),(n), 5(b)(c)(d)(e), 10(f), (h),(i) – Sub-Claims Raised Under Different Theories in State Court.**

Mr. Coley raised the above sub-claims under a different theory in state court than he does in his Amended Petition. Specifically, he raised the claims as distinct grounds

35

for relief to the Ohio courts rather than the ineffective assistance of counsel claims or prosecutorial misconduct claims he raises in this habeas proceeding.  The Sixth Circuit has held that to exhaust a claim, a petitioner must present it "to the state under the same theory in which it is later presented in federal court. See Hicks v. Straub, 377 F.3d 538, 552-53 (6th Cir. 2004)(holding that "the exhaustion doctrine requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review.")(quoting Pillette v. Foltz, 824 F.2d 494, 497 (6th Cir. 1987)); Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998).  The Court finds that these sub-claims are procedurally defaulted because they were never presented to the Ohio courts under the same theory as they are raised in the Amended Petition.[8]

---

[8]        Following this same logic, the Court would be inclined to find that any claims Mr. Coley raised in his Murnahan application but not raised as ineffective assistance of appellate counsel in the Amended Petition would also be procedurally defaulted.  In the Amended Return of Writ, however, the Respondent contends that any claim raised in Mr. Coley's Murnahan application is properly preserved for habeas review.  See, e.g., Amended Return at 105 ("A number of these [sub-]claims were raised in Coley's application for reopening in the Supreme Court of Ohio.  As these sub-claims were raised in the Supreme Court of Ohio, they are preserved for habeas review.").
        The Court is not required to engage in a sua sponte analysis of procedural default where respondent has declined to raise the issue. "[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter."  Trest v. Cain, 522 U.S. 87, 89 (1997) (internal quotation marks and citations omitted).  Thus, a habeas court may forego a procedural default analysis and address the merits of a claim when the respondent fails to raise this defense.  See, e.g., Jamison v. Collins, 100 F. Supp.2d 521, 597 (S.D. Ohio 1998)(addressing merits of claim when respondent failed to raise procedural default defense in return of writ or supplement to return of writ).  The Court does, however, have discretion to apply this procedural bar sua sponte in some circumstances.  See Lorraine v. Coyle, 291 F.3d 416, 426 (6th Cir. 2002); Elzy v. United States, 205 F.3d 882, 886 (6th Cir. 2000).

36

### c.   Grounds for Relief 6(a),(b), 7, and 14(c),(e) – Claims to Which the Ohio Supreme Court Applied a Plain Error Analysis

Although Mr. Coley presented the above claims to the Supreme Court of Ohio on direct appeal, that court held that it would review them pursuant to a plain error analysis because Mr. Coley did not object to these alleged errors during trial.  Ohio courts have held that a failure to contemporaneously object to an alleged error constitutes procedural default.  State v. Williams, 51 Ohio St.2d 112 (1977).  If a defendant fails to object to a trial error that would affect a substantial right, then the appellate courts will conduct a plain error analysis of that claim.  State v. Slagle, 65 Ohio St.3d 597, 604 (Ohio 1992).[9]  In reviewing a claim for plain error, an appellate court necessarily must address the underlying merits of the claim.  In Seymour v. Walker, 224 F.3d 542 (6th Cir. 2000), the Sixth Circuit recognized that this type of review does not constitute an actual merit review of a claim so that a federal habeas court can assume that the state court has forgiven the procedural default: "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."  Id.

---

Because the Respondent affirmatively asserts that claims raised in Mr. Coley's Murnahan application are not defaulted even though they are not raised as ineffective assistance of appellate counsel claims here, the Court finds that claims 4(g),(h),(i),(j),(k),(l) and (m), 5(a), 10(a),(b),(c),(d), and (e), 11(a), 13(a), and 14(d) are preserved for federal habeas review.

[9]   Additionally, Ohio Rule of Criminal Procedure 52(B) states:

> **(B) Plain error**
> Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

at 557.  Thus, the Court finds that the claims to which the Supreme Court of Ohio

applied a plain error analysis are procedurally defaulted.

### d.    Mr. Coley's defenses to the procedural default bar

#### i.    Cause and Prejudice[10]

##### a.    Ineffective Assistance of Appellate Counsel

Mr. Coley asserts several arguments to support his claim that ineffective

assistance of appellate counsel can serve as "cause" to excuse his procedurally

defaulted claims.  He asserts that appointed counsel's failure to inform him about his

right to file an application to reopen his direct appeal is grounds to excuse any

procedural default.  Mr. Coley also argues that Ohio's application to reopen process is

not an adequate and independent ground on which to find his claims procedurally

---

[10]    Mr. Coley asserts in the Amended Traverse that the rule enunciated in
State v. Perry, 10 Ohio St.3d 175 (1967), is not an independent state
ground on which to bar relief because it is not independent of federal law.
Under the Perry doctrine, a final judgment of conviction bars a convicted
defendant from raising and litigating in any proceeding, except an appeal
from that judgment, any defense or any claimed lack of due process that
was raised *or could have been raised* by the defendant at the trial on the
merits, or on appeal from that underlying judgment.  Id. at 108; see also
State v. Roberts, 1 Ohio St.3d 36, 39 (1982)(holding policy behind Perry
bars post-conviction petitioners from raising issues that could have been
raised on direct appeal in a collateral proceeding to avoid reversal of
conviction based on collateral, rather than constitutional, issues).  Thus,
unless a claim is based on evidence *dehors* (outside of) the record, it
must be raised during direct appeal, or be deemed waived.
    Mr. Coley never filed a post-conviction relief petition, however, thus
no Ohio court refused to review his claims pursuant to the Perry doctrine.
Accordingly, the Court does not address the Perry arguments raised in the
Amended Traverse.

defaulted.  The Court addresses each of Mr. Coley's arguments but finds that none is persuasive.

### b.  Application to Re-Open Direct Appeal

Mr. Coley concedes that he filed his application to re-open outside the ninety day time period required under Ohio Supreme Court Rule XI(6)(A).  He asserts that he was never informed of the right to file such an application in a timely fashion.  Moreover, he observes that the State of Ohio never provided him counsel to pursue this appeal.  Because the application to re-open is part of the direct appeal, Mr. Coley concludes, the Court should permit him to utilize ineffective assistance of appellate counsel as "cause" to excuse the default of any claim raised in the Amended Petition.  Alternatively, Mr. Coley contends that the application to re-open is an inadequate procedure and violates his equal protection and due process rights.

The Sixth Circuit recently revisited the issue of whether Ohio's application to re-open procedure is a direct appeal, requiring assistance of counsel under the Sixth Amendment of the U.S. Constitution, or is part of Ohio's post-conviction proceedings.  Lopez v. Wilson, 426 F.3d 339 (6th Cir. 2005).  Overruling White v. Schotten, 201 F.3d 743 6th Cir. 2000), which had held that Ohio's application to re-open the direct appeal process was part of a criminal defendant's direct appeal as of right affording him or her the right to effective assistance of counsel under the Sixth Amendment, the Lopez court held that, upon reviewing "the relevant state law, the distinctions between direct review and collateral review, and the structure and function of the AEDPA," the application to reopen procedure in Ohio was not part of the direct appeal but a post-conviction proceeding in which a petitioner had no right to counsel.  Id. at 352.

39

The Lopez holding undermines Mr. Coley's assertion that he was denied the right to counsel to file an application to reopen in a timely manner because he possessed no right to counsel to file such an application. Thus, the State of Ohio's failure to provide him counsel and the failure of any such counsel to inform him of how to file an application to re-open does not implicate any constitutional right. Accordingly, Mr. Coley cannot use ineffective assistance of appellate counsel to excuse the default of any claim based on his assertion that he had a right to counsel to perfect this appeal.

Mr. Coley's claim that the application to re-open process does not afford him the right to due process and equal protection also is without merit. Mr. Coley does not identify any constitutionally cognizable claim. Criminal defendants have the right to effective assistance of counsel under the Sixth Amendment pursuant to Strickland v. Washington, 466 U.S. 668 (1984). Moreover, the Supreme Court has recognized an indigent defendant's right to the effective assistance of counsel both during trial and on direct appeal. Gideon v. Wainwright, 372 U.S. 335 (1963). If declared indigent, a criminal defendant also possesses the right to obtain a competent psychiatrist if the defendant's sanity at the time the crime was committed is at issue. Ake v. Oklahoma, 470 U.S. 68 (1985). The Supreme Court has declined, however, to extend the indigent defendant's rights beyond this scope.

Additionally, the Supreme Court has limited an indigent defendant's rights under the Equal Protection Clause, holding that indigents are not a protected class whose rights need to be on equal footing with those more economically advantaged. In Ross v. Moffitt, 417 U.S. 600 (1974), the Supreme Court declined to extend the Sixth Amendment right to counsel to post-conviction proceedings. In that case, the Court

40

noted that the Equal Protection Clause does not require the State to afford indigent defendant's absolute economic equality with other defendants.  Id. at 612. Consequently, the Court held that the Ross petitioner was not entitled to counsel at the discretionary appeal stage.

Because an application to reopen is not part of Ohio's direct appeal, Mr. Coley was not entitled to counsel at that stage of his state court proceedings and was therefore not denied due process or equal protection of the law by being deprived of counsel to file his application.  Accordingly, he cannot use ineffective assistance of appellate counsel as cause to excuse the default of any claims.

### c.    Counsel's Failure to File a Post-conviction Relief Petition

Mr. Coley argues that counsel's failure to file a post-conviction petition is another ground for the Court to excuse the procedural default of his claims.  As stated above, Mr. Coley filed a pro se motion for appointment of counsel to file a post-conviction relief petition.  The trial court granted Mr. Coley's motion on 28 September 1998.  No post-conviction petition was filed on Mr. Coley's behalf, however, prior to the expiration of the statute of limitations.  Upon learning that appointed counsel had not filed a petition for post-conviction relief, Mr. Coley contacted the OPD to request legal assistance.  The OPD responded that it could not represent Mr. Coley because of a conflict of interest.

Mr. Coley asserts this claim in his ineffective assistance of appellate counsel claim in ground for relief eleven in the Amended Petition.  The Court will address his arguments when it reviews the merits of that claim, infra.  For the reasons stated

41

therein, the Court finds that Mr. Coley cannot use post-conviction counsel's failure to file a post-conviction petition as "cause" to excuse his procedurally defaulted claims.

### ii.     Miscarriage of justice exception

Mr. Coley argues that, to the extent any of his claims are procedurally defaulted and the Court does not find cause and prejudice to excuse them, the court should utilize the miscarriage of justice exception to a procedural bar because he is actually innocent.  Pursuant to the miscarriage of justice exception to the procedural default bar, a habeas petitioner's actual innocence of a crime entitles that petitioner to a merit review of his or her claims.  Schlup v. Delo, 513 U.S. 298, 314-15 (1995).  In Schlup, the United States Supreme Court determined that the petitioner in that case should have been afforded a merit review of his claims after evidence suggested that he had been the victim of mistaken identity in the murder of a prison inmate.

The Schlup Court held that, where a petitioner seeks to utilize claims of actual innocence as a gateway to assert he was wrongly convicted of the crime, rather than merely objecting to the death sentence, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Id. at 327 (quoting Murray v. Carrier, 477 U.S. at 496).  To constitute the necessary "probability," the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id.  The Schlup Court described the specific analysis the district court must employ when faced with a petitioner's allegation of actual innocence:

> It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what

42

reasonable, properly instructed jurors would do.  Thus, a petitioner does not meet the threshold requirement unless he [or she] persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him [or her] guilty beyond a reasonable doubt.

Id. at 329.

Significantly, the Schlup Court reaffirmed an earlier finding that, where a petitioner claims he is actually innocent of the death penalty, as opposed to the underlying crime, a more rigorous standard applies, a standard in which a petitioner "must show by clear and convincing evidence that but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." 513 U.S. at 323 (citing Sawyer v. Whitley, 505 U.S. 333 (1992)) (internal quotation marks and citations omitted).

The United States Supreme Court affirmed that the Schlup holding remains the standard by which actual innocence claims are reviewed.  In House v. Bell, 547 U.S. 518 (2006), the Court held that a death row inmate had met the Schlup standard by introducing new evidence sufficient to permit him to obtain a merit review of his procedurally defaulted claims.  Before reaching its conclusion, the House Court meticulously outlined the new evidence that the jury had been deprived the opportunity to examine, finding it to be substantial enough to meet the Schlup standard. Id. at 540-544.

In the instant case, Mr. Coley does not specify what "new evidence" he offers to persuade the Court that he is actually innocent and/or actually innocent of the death penalty.  Accordingly, the Court finds that the miscarriage of justice exception to the procedural default bar is not available to Mr. Coley.

43

**E.**    **Merit Review of Procedurally Defaulted Claims**

       **1.**    **Juror Misconduct: First Ground for Relief**

In Mr. Coley's first ground for relief he asserts that he was denied a fair trial because the jury was compromised.  He believes that the jury was not impartial because of related incidents that occurred during the trial.  Mr. Coley first cites an incident in which one juror expressed concerns for his safety.  Another juror stated that an incident which occurred while she was at home involving strangers driving by caused her some concern.  Finally, Mr. Coley claims that the jury was biased against him because one juror told the trial court that she received a pamphlet about the death penalty while serving on the jury.  Mr. Coley asserts that the trial court should have removed these jurors.  Failing to do so, he maintains, led to a verdict delivered by a tainted jury.

The due process clause of the United States Constitution states that a criminal defendant has the right to a fair trial and to be tried by a fair and impartial jury.  The right to due process, however, does not necessarily require a new trial in every instance in which a juror is potentially biased.  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Id. (citing Remmer v. United States, 347 U.S. 227 (1954)).

In Zuern v. Tate, 336 F.3d 478 (6th Cir. 2003), the Sixth Circuit held that when a habeas court addresses a claim of juror misconduct, it must consider four points: (1) whether the state court held a hearing; (2) no presumption of prejudice arises from any

44

improper contact; (3) the petitioner bears the burden of proving actual bias; and, (4) juror testimony at a hearing is not inherently suspect. Id. at 486 (quoting United States v. Rugerio, 20 F.3d 1387, 1390 (6th Cir. 1994)).  The Zuern court found that the petitioner's juror misconduct claim had no merit because the trial court held a hearing on the issue, finding that the juror in question could be fair and impartial, and defense counsel failed to object to the juror's continued presence on the panel.  Id.

Here, the trial court's actions as to each incident of Mr. Coley's alleged juror misconduct undercut his allegations.  In the first incident, juror Edwin Farbrother expressed concerns for his safety in the courtroom.  The trial judge held a conference with him in camera and on the record as follows:

| | |
|---|---|
| THE COURT: | All right.  We're in chambers now outside the hearing of other jurors.  We have the Court, counsel and Mr. Coley present.  We have Juror 252. |
| | Juror 252, you spoke with my bailiff concerning something, and I'd like you to share that with us.  What's the problem? |
| MR. FARBROTHER: | Yes, I just - - I feel like we should have a little bit - - I haven't discussed it with anybody else but I feel like [there] should be a little more maybe protection towards us when we're outside the building and the filtering of people coming in more closely, maybe. |
| THE COURT: | Okay.  Now, you're saying this is just a feeling you have? |
| MR. FARBROTHER: | A feeling I have. |
| THE COURT: | You have not said anything to any other juror? |
| MR. FARBROTHER: | No. |
| | * * * |
| MR. FARBROTHER: | As regards there was a person removed earlier. |

45

| | |
|---|---|
| THE COURT: | Because he was snoring? |
| MR. FARBROTHER: | Yeah. * * * He kind of stayed around outside and was walking around. |
| THE COURT: | Okay.  Did that bother you? |
| MR. FARBROTHER: | Yes. |
| | * * * |
| THE COURT: | Will it influence in any way your ability to arrive at a fair and just verdict or verdicts? |
| MR. FARBROTHER: | No. |

(Docket # 43, at 1608-1612).

Thereafter, the court invited counsel for the State and the defense to question Mr. Farbrother regarding his ability to continue serving as a juror on the case.  Defense counsel had no questions for Mr. Farbrother.  The court again questioned Mr. Farbrother about his ability to serve as a fair and impartial juror:

| | |
|---|---|
| THE COURT: | Would you hesitate to perform your duties and responsibilities as a juror that you've taken an oath to abide by because of this? |
| MR. FARBROTHER: | No. |
| THE COURT: | Because if you would, then we would - - would address that. |
| MR. FARBROTHER: | No. |
| THE COURT: | And there's no right or wrong answer, again, to any of these questions.  It's what I'm asking to understand so I'm satisfied. |
| MR. FARBROTHER: | No, I would not have a problem. |

46

Id. at 1617.   At the conclusion of the conference, the court dismissed the juror and asked counsel if they had any objection to Mr. Farbrother continuing on the case.  Both counsel responded that they had no objection.  Id. at 1619.

The trial transcripts reveal that the court pointedly questioned Mr. Farbrother about his ability to continue as a juror based on his security concerns.  He repeatedly responded that his concerns would not interfere with his ability to listen to the evidence and consider it before arriving at a verdict.  Moreover, the defense team did not object to Mr. Farbrother's continued service on the jury.  Thus, pursuant to the Zuern holding, Mr. Coley cannot demonstrate juror Farbrother was actually biased against him or that his membership on the panel denied him the right to a fair and impartial jury.

Mr. Coley next asserts that another juror on his panel was prejudiced against him.  Juror Kathleen North reported to the trial court that an incident that occurred while she was at home disturbed her and made her feel unsafe.  The trial court once again held an in camera hearing regarding this incident on the record:

THE COURT:          All right.  We're in chambers now outside the hearing of other jurors and we have Juror 271 with us.  And Juror 271 communicated with my bailiff this morning when she came in, and I am going to recite what was communicated to me by my bailiff and you tell me if this is correct:

That this weekend on Saturday after the jury had completed its listening to the evidence and you went home, you were working out in your yard, your husband was working out in the yard, too.  A car proceeded to drive down your street slowly, turn around, drive back, and eventually the driver of the vehicle summoned your husband and asked directions.  Is that correct?

                                                        * * *

MS. NORTH:          Yes.

THE COURT:          Now, why are you bringing that to our attention?

47

MS. NORTH:        It was an unusual kind of situation.  The person that was driving the car was black.  This is a neighborhood that that's not usual and I - - I don't mean to be disrespectful in any way, but it's not a common thing to have happen.

The directions that he was asking for, when he came down, my husband noticed he had come from a direction where the street that he was asking for would have been visible and he would have passed it; and if he had circled twice, he would have passed it twice.  It's not difficult to see the street sign at all.

And I just made a mental note of it.  I thought it was very odd.  He slowed down.  The garage door was open.  Both cars were right there, so he could have looked to see to make sure that that was my car, if that was his intention

It could have been purely coincidental but that's very unusual to have happen.

THE COURT:        All right.  Now, the fact that you've shared this with us, does it impact in any way your ability to be a juror in this case?

MS. NORTH:        No, no.  It just was something that - - I just kind of tucked it away and I thought, well, I need to be careful, you know.  But then, again, I didn't want to make a big deal out of it either - - * * * because it could have been purely coincidental.
                                      * * *

THE COURT:        All right.  Now, let me ask you this: Do you hold that incident against the defendant, Douglas Coley?

MS. NORTH:        No, no.

THE COURT:        Will it impact in any way your ability to arrive at a fair and just verdict or verdicts in this case?

MS. NORTH:        No.

(Docket # 45, at 1972-76).   After Ms. North departed, the trial court asked counsel whether they objected to her sitting on the jury.  Both counsel responded that they had no objections.

48

As with the Juror Farbrother incident, the trial judge took care to be certain the juror fully explained the incident and questioned her regarding her ability to serve fairly and impartially.  Defense counsel did not object to Juror North's serving as a jury member.  Mr. Coley has not shown that this juror was actually prejudiced against him or that her service impeded his right to a fair and impartial jury.

Finally, Mr. Coley asserts that one other incident improperly influenced the jury. Juror Judith Travis reported that she discovered a pamphlet about the death penalty on her porch.  She stated that although she did not read the pamphlet before disposing of it, she did ask fellow jurors if they had received any pamphlets regarding the death penalty.  (Docket # 46, at 2077).  In an in camera conference on the record, the trial court questioned Ms. Travis regarding her ability to be a fair and unbiased juror.  She responded that the pamphlet would not interfere with her ability to perform her duties as a juror.  Counsel for the State and defense were permitted to question juror Travis.  The trial court then conducted an individual voir dire of each juror regarding whether they had heard what juror Travis had asked them or if they could remain fair and impartial members of the jury.  After conducting this voir dire, the trial court was satisfied that the jury remained impartial and each member was permitted continued participation.

As with the two previous instances of alleged juror bias, Mr. Coley has not demonstrated that any of the jurors were prejudiced against him or that he was denied a fair trial.  The trial court made a proper effort to discern whether any of the jurors were influenced by Ms. Travis's question.  Each juror responded that he or she was not influenced by Ms. Travis's question and that he or she could examine the evidence presented in accordance with the law.  As with the two previous instances, Mr. Coley's

49

counsel did not object to the jurors continuing on his case or assert that any individual

jury member was biased against Mr. Coley.  Because Mr. Coley has failed to

demonstrate, pursuant to Zuern, that this or any of the incidents involving the jurors led

him to be denied the right to a fair and impartial jury, this claim is not well-taken.

### 2.    Improperly Dismissed Jurors: Second Ground for Relief

Mr. Coley asserts that the trial court improperly excused four prospective jurors

because they expressed an adversity to imposing the death penalty.    Prior to trial, the

court individually questioned all potential jurors regarding their views on the death

penalty and whether they could impose a sentence based on the evidence presented at

trial.  Four panel members the court questioned stated that they could not impose the

death penalty under any circumstances.  After requesting responses from both the

State and the defense, the trial court dismissed these jurors.  Mr. Coley asserts that the

court's dismissal of these jurors entitles him to habeas relief.

In Witherspoon v. Illinois, 391 U.S. 510, 521-22 (1968), the United States

Supreme Court invalidated a capital sentence when the trial court excused all jurors

who expressed a conscientious objection to the death penalty.  The Court reasoned

that the proper inquiry was not whether a prospective juror opposed the death penalty

generally, but whether the juror's religious, moral, or philosophical beliefs would prevent

him or her from following the court's instructions.  Id. at 514 n.7 ("[E]ven a juror who

believes that capital punishment should never be inflicted and who is irrevocably

committed to its abolition could nonetheless subordinate his personal views to what he

perceived to be his duty to abide by his oath as a juror and to obey the laws of the

State.").

50

The U.S. Supreme Court revisited this issue after lower court confusion arose over how to apply the <u>Witherspoon</u> standard, determining:

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

<u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980); <u>see also</u> <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985)(*affirming* <u>Adams</u> standard).

In addition to providing trial courts instruction on how to select jury members, the Supreme Court has guided reviewing courts on how to conduct their analyses. In <u>Gray v. Mississippi</u>, 481 U.S. 648 (1987), the Court determined that because the right to an impartial jury was so intrinsic to the right to a fair trial, a harmless error analysis could not remedy such a trial defect. <u>Id.</u> at 668. Instead of employing a harmless error analysis or permitting the reviewing court to substitute its own decision for that of the trial court, the reviewing court must determine "whether [the trial court's] findings are supported by the record." <u>Wainwright v. Witt</u>, 469 U.S. 412, 434 (1985). Thus, a reviewing court must undertake an independent review of the record when determining whether the trial court's decision to include or exclude a juror was proper.

51

Although a reviewing court reviews the record independently, the Supreme Court recently held that a habeas court must give much deference to the trial court's determination regarding whether a prospective juror is qualified to serve because it is in the best position to perceive a juror's demeanor.  In Uttecht v. Brown, 551 U.S. 1 (2007), the Court held that the trial court properly excused for cause a juror who equivocated about his ability to impose the death penalty and appeared at times confused about the law.  Although the Uttecht Court recognized that deference to a trial court "does not foreclose the possibility that a reviewing court may reverse the trial court's decision [to excuse a juror for cause] where the record discloses no basis for a finding of substantial impairment," it held that when "there is lengthy questioning of a prospective juror and the trial court has supervised diligent and thoughtful voir dire, the trial court has broad discretion."  Id. at 20.

In all four instances which Mr. Coley cites, the prospective jurors expressed unequivocal reservations about imposing the death penalty under any circumstances. After stating several times that he was not comfortable imposing the death penalty, venire member Lozaro Resendez responded expressly that his views on the death penalty would prevent him from following the trial court's instructions on the law. (Docket # 38, at 602).   Similarly, prospective juror Essie Goldsmith expressed that she was taught at church not to judge others.  When the trial court pressed her regarding whether she could follow the law despite her religious teachings, Ms. Goldsmith responded, "I don't think - what I'm saying.  I could go along with the law up to [a] point. I don't think I could sign the death penalty."  (Docket # 38, at 686).  When the trial court queried venire member Gerald Hinz regarding his views on the death penalty, he

52

unequivocally responded, "I feel another person shouldn't be judged for taking another person's life." Id. at 791. He then stated that under no circumstances would he impose such a penalty. Finally, Colleen Williams stated that based on her religious beliefs, she believed it was wrong to pass judgment on an individual. When the trial court pressed her, she stated that because of her beliefs, she would be unable to follow the law if the law required imposing a death sentence. Id. at 834.

Based on the law as recited above, it is clear that the trial court was well within its discretion to excuse each of the venire members. Each of them definitively stated that they would not be capable of imposing a death sentence under any circumstances. Thus, their moral and/or philosophical beliefs would prevent them from following the law pertaining to the death penalty. Pursuant to the Uttecht holding, this Court must defer to the trial court's observations as long as they are supported by the trial record. Here, it is clear that the trial judge, who observed the venire members' actual demeanor, concluded that they would be unable to abide by the law as instructed to them. Because of their unequivocal statements about imposing the death penalty, the trial record supports the trial judge's findings. Accordingly, Mr. Coley's second ground for relief has no merit.

### 3. Batson Claim: Third Ground for Relief

Mr. Coley's third ground for relief is based on Batson v. Kentucky, 476 U.S. 79 (1986). In that case, the United States Supreme Court held that a prosecutor is not permitted to use race as the basis for excusing a potential juror from serving on a jury. Mr. Coley asserts that the State violated the Batson holding during his trial when it

53

exercised a peremptory challenge to excuse the only African-American member of the panel.

As stated above, the Batson Court held that a prosecutor may not use a peremptory challenge to strike a venire member on racial grounds.  If a criminal defendant wishes to raise a Batson challenge to a prosecutor's peremptory challenge, the trial judge must utilize a three-step inquiry:

> First, the trial court must determine whether the defendant has made a prima facie case showing that the prosecutor exercised a peremptory challenge on the basis of race.  . . . .  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror.  . . . .  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.

Rice v. Collins, 645 U.S. 333, 338 (2006)(further citations omitted).   Under the AEDPA, a habeas court can only grant relief on a Batson claim if the trial court "was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge," because "State-court factual findings . . . are presumed to be correct."  Id. at 338-339 (citing 28 U.S.C. § 2254(e)(1); Miller-El v. Dretke, 545 U.S. 231, 240 (2005)).

During voir dire, defense counsel objected to the State's use of a peremptory challenge to excuse juror 303, who stated on a jury questionnaire that she was Jamaican.  The trial judge then conducted a sidebar hearing to discern whether the State had a race-neutral reason for using a peremptory challenge to excuse this juror. The State articulated its reasons as follows:

> MR. MANDROSS:  Judge, I would agree that this is the first person who I guess is arguably an African-American, but I think there are at least four more potential remaining in the pool.  I have multiple reasons for exercising this peremptory.  Initially she said when she came in, we discussed the issue of the death penalty.  She said she was philosophically opposed.  She

54

later stated that in certain cases, she might deem it appropriate, like a serial killer who has taken more than a few lives.  She already said that she probably could not impose the death penalty, though she did ultimately say she could follow the Court's instructions, but she gave conflicting answers initially.

Also she came in late saying that her reason was she totally forgot about it.  She's relatively young, 26, close to the age of the defendant, that's another reason.  She grew up in formative years in Los Angeles, California, and her cultural experience in being brought up in Los Angeles, California coupled with her listed birthplace in Jamaica, and being Jamaican, the State is uncomfortable with that.  Also, she initially said that she didn't recall the charges and thought the charge was attempted murder, but later indicated that she spoke with Chris, she spoke with Chris Neal and she knew that it was - it was a homicide and she knew the victim was found in a fetal position which is true, that it was cold out, which is accurate, so

THE COURT:        Is this the juror who knows - -

MR. MANDROSS:  She knows a witness who is going to be called to testify.  He lives across the street.

(Docket # 39, at 1218-19).  The trial court accepted the State's reasoning, holding that the State provided several race-neutral reasons for exercising a peremptory challenge to excuse the juror and overruled the defense's objection.  Id. at 1220-21.

Mr. Coley asserts that the State's articulated reasoning supports his contention of a Batson violation.  He claims that the State's use of the words "cultural experience" was a euphemism for race.  While the prosecution's use of those words is of concern, the State provided several race-neutral grounds for using a peremptory challenge to excuse her.  Most significantly, the juror knew and lived across the street from one of the witnesses who was to testify during trial.  Thus, the trial court's finding that there was no Batson violation is entitled to deference.  Miller-El, 545 U.S. at 240.  Because

55

Mr. Coley cannot demonstrate that the State excused juror 303 solely because of her race, this claim is not well-taken.

### 4.    Ineffective Assistance of Trial Counsel: Grounds for Relief 4(a), (b), (c), (d), (e), (f), (n), and 10(f), (g), (h), and (i)

In Mr. Coley's fourth and tenth grounds for relief, he claims that he should be granted habeas relief based on ineffective assistance of trial counsel at both the culpability and sentencing phases of trial.  Both these claims contain numerous sub-claims.  The Court will address only the defaulted sub-claims below.

### a.    <u>Strickland v. Washington</u> and its progeny

To assert a successful ineffective assistance of counsel claim, a petitioner must point to specific errors in counsel's performance.  <u>United States v. Cronic</u>, 466 U.S. 648, 666 (1984).   Thereafter, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." <u>Strickland v. Washington</u>, 466 U.S. 688, 690 (1984).  A reviewing court must presume that counsel's conduct was reasonable and might be part of a trial strategy.  <u>Id.</u> at 689. To ascertain whether counsel's performance prejudiced a criminal proceeding, a reviewing court does not speculate whether a different strategy might have been more successful, but a court must "focus on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993).  As the Supreme Court affirmed in <u>Bell v. Cone</u>, "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Bell v. Cone, 535 U.S. 685, 698 (2002)(*quoting* Strickland, 466 U.S. at 689).

### b.    Fourth Ground for Relief

#### i.    Sub-claims (b) –  gruesome and cumulative photos, (c) –  improper jury instructions, and (f) – objections to nonstatutory aggregating factors

Mr. Coley asserts that his trial counsel were ineffective on numerous instances during the culpability phase of trial.  Initially, the Court finds that three of Mr. Coley's defaulted sub-claims in this ground for relief are raised as distinct claims elsewhere in the Amended Petition.  As is discussed infra, these claims lack merit.  Because a habeas court need not address the "objectively unreasonable" element of Strickland if it finds that a petitioner cannot establish the "prejudice" prong, see Sowell v. Bradshaw, 372 F.3d 821, 838 (6th Cir. 2004)("The court is not required to address both components of Strickland if one component fails")(citation omitted), the Court declines to address the merits of sub-claims (b)(gruesome and cumulative photographs), (c)(improper jury instructions), and (f)(object to non-statutory aggravating factors) as Mr. Coley cannot establish that counsel's alleged unreasonable behavior prejudiced the outcome of his proceedings.[11]

---

[11]    Specifically, the Court finds that Mr. Coley cannot establish prejudice because of the Court's finding that the following underlying claims lack merit: sub-claims (b), gruesome and cumulative photos, and (f), objection to non-statutory aggravating factors are addressed below in grounds for relief seven and twelve.  Sub-claim (c), improper jury instructions, is addressed in ground for relief fourteen.

### ii.     Sub-claim (a) – change of venue

Mr. Coley asserts that his counsel were ineffective for failing to move the trial court for a change of venue.  Counsel should have so moved, Mr. Coley contends, because the prosecution was influenced by at least two articles published by the local newspaper, the Toledo Blade.  Specifically, he asserts that because the articles in the Blade questioned why there was no capital indictment for the offenses, the prosecution then re-indicted Mr. Coley on capital charges.  Mr. Coley argues that his counsel should have moved for a change of venue before trial because of pre-trial publicity.

The Supreme Court determined in Irvin v. Dowd, 366 U.S. 717 (1961), that finding a jury totally ignorant of a case is difficult.  In that case, the Court determined that:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in a criminal case.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption or a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Id. at 722-23.

Following this precedent, the Sixth Circuit has held that it is sufficient if a juror who has formed an impression as to guilt or innocence from pre-trial publicity can put aside that impression and render a verdict based solely on the evidence.  Kelly v. Winthrow, 25 F.3d 363, 368 (6th Cir. 1994), cert. denied, 513 U.S. 1061 (1994).

58

Accordingly, a petitioner must point to a jury's overt expression of bias to succeed on a change of venue claim.

The Court finds that this sub-claim fails as Mr. Coley can neither demonstrate that counsel's actions were objectively unreasonable nor can he establish the prejudice required to obtain relief.  While Mr. Coley notes that one of the victims, David Moore, identified the perpetrators from an evening news broadcast, he fails to elaborate how this impacted the jury or its ability to decide his case fairly.  Moreover, he points to no portions of the habeas record that could demonstrate the jury's bias based on pre-trial publicity.  As such, sub-claim (a) is without merit.

### iii.    Sub-claim (d) – failure to merge convictions and death sentences

In this sub-claim, Mr. Coley asserts that counsel should have objected to the trial court's failure to merge eligible convictions and death sentences because there was only one victim.  Mr. Coley raised this claim as a distinct ground for relief on direct appeal.  The Supreme Court of Ohio held on direct appeal that Mr. Coley's assertion was factually incorrect, stating: "Coley misreads the record.  The trial court merged the three murder charges against Coley into a single offense.  The trial jury verdict referred to one death penalty, and the trial court imposed only a single death penalty."  State v. Coley, 93 Ohio St.3d 253, 264 (2001).  Mr. Coley neither explains why the Supreme Court of Ohio's decision is erroneous nor provides a further factual basis to support his claim.  Because he does not explain why his assertions regarding merger are not erroneous as described by the Supreme Court of Ohio, this sub-claim is not well-taken.

59

### iv. Sub-claim (e) – failing to request intent to kill instructions

Mr. Coley next asserts that defense counsel were ineffective for failing to request an instruction that finding intent to kill based on the means and commission of the crime is not conclusive. As with sub-claim (d), Mr. Coley raised this claim as a distinct ground for relief to the Supreme Court of Ohio on direct appeal. As with sub-claim (d), the court held that Mr. Coley's assertion was factually incorrect. It stated:

> In fact, the trial court did instruct the jury that the inference was not conclusive:
>
>> "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to * * * destroy life or inflict great bodily harm, the purpose to cause the death *may be inferred* from the use of the weapon. However, the *use of a deadly weapon is not conclusive evidence of a purpose* to cause the death of another. *Whether or not you draw the inference* of purpose to kill from the use of the deadly weapon *is entirely up to you.*"

Id. at 268-69 (emphasis in original). Mr. Coley does not explain why this instruction was insufficient to inform the jury about the non-conclusive nature of the use of deadly force when committing an offense with a deadly weapon. Counsel cannot be ineffective for failing to request an instruction the trial court actually provided to the jury. This claim lacks merit.

### v. Sub-claim (n) – "opening door" for the State

Mr. Coley alleges that trial counsel were ineffective when they questioned a witness in such a manner as to open the door for the State to question the witness about items previously deemed inadmissible. During re-cross-examination of State witness Tyrone Armstrong, defense counsel questioned him regarding inconsistent statements he had made about when he had first seen certain weapons.

60

Consequently, the State was permitted to query Mr. Armstrong about a letter he had received from Mr. Coley:

> BY MR. MANDROSS:
>
> Q     And Tyrone, did you turn that letter over to the authorities?
>
> A     Yes, I did.
>
> Q     And without being specific, what was the general nature of that letter from
> - - from your cousin?  Did he make a request of you?
>
> A     Yes.
>
> Q     And what was that?
>
> A     I guess he wanted me to lie for him.

(Docket # 43, at 1797-98).  While the trial court did permit the State to question Mr. Armstrong generally about the letter based on defense counsel's questioning, there was testimony prior to this colloquy in which Mr. Armstrong revealed that Mr. Coley had asked him to lie for him.[12]  Thus, even if counsel were unreasonable for permitting the prosecution to be able to question Mr. Armstrong about the letter, it did not prejudice the outcome of the trial because the jury already was aware that Mr. Coley had asked Mr. Armstrong to lie on his behalf.  Therefore, this sub-claim is not well-taken.

---

[12]     On direct examination, the State elicited the following testimony from Mr. Armstrong:
> Q:     Now, did you have some more conversations with your cousin Doug?
> A:     Yes, I did.
> Q:     And tell this jury what he wanted you to do in that regard.
> A:     He had wanted me to lie for him.

(Docket # 43, at 1756).

c. **Ground for Relief 10(f) evidence of aggravating factors, (g) failure to request instruction, (h) prosecutor's comments, and (i), failure to object**

i. **Sub-claims (f) – evidence of aggravating factors, and (h) – prosecutor's comments**

As with some of the sub-claims from Mr. Coley's fourth ground for relief, sub-claims (f)(introduction of evidence in support of non-statutory aggravating factors) and (h)(prosecutorial comments on Mr. Coley's failure to testify) are addressed as distinct grounds for relief elsewhere in this Opinion. Because the Court finds those claims are not well-taken, Mr. Coley has failed to establish the prejudice required to obtain habeas relief for an ineffective assistance of counsel claim. Sowell v. Bradshaw, 372 F.3d 821, 838 (6th Cir. 2004). Thus, the Court declines to address the merits of sub-claims (f) and (h) at this juncture.[13]

ii. **Sub-claim (g) – failure to request instruction**

Mr. Coley asserts that counsel were constitutionally ineffective because they failed to request an instruction that his lack of testimony should not be considered during mitigation deliberations. He claims that because counsel did not request, and the trial court did not provide, such an instruction, the jury may have believed that it could consider his lack of testimony during the mitigation phase of trial.

The trial court did charge the jury with such an instruction during the culpability phase of trial. (Docket # 47, at 2232-33). The trial court asked counsel at the conclusion of the mitigation phase of trial whether they would like the identical

---

[13]     The Court will address the factual underpinnings of sub-claim (f) when it reviews the twelfth ground for relief and sub-claim (h) when it reviews ground for relief 5(e).

62

instruction to be read to the jury. Both counsel and Mr. Coley indicated that they did not want the instruction read to the jury. (Docket # 48, at 2522).

Counsel's failure to request this instruction was not constitutionally ineffective behavior. Although counsel failed to articulate on the record why they did not want the trial court to provide this instruction to the jury, a reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. Strickland, 466 U.S. at 689. Because counsel's reasons for not wanting this particular instruction may have been an effort not to call attention to Mr. Coley's decision not to testify during mitigation, the Court presumes it was a strategic decision by the defense. This sub-claim is not well-taken.

### iii.    Sub-claim (i) – failure to object

Finally, Mr. Coley asserts counsel's ineffectiveness because counsel failed to object to the imposition of the death penalty when the State did not prove essential elements of aggravated murder. Mr. Coley fails to specify for which elements, precisely, the State provided insufficient evidence. Without more detail, the Court cannot address this claim.

### 5.    Prosecutorial Misconduct: Grounds for Relief 5(b),(c),(d), and (e) – Gruesome Photos, Victim Impact, Improper Questions and Comments

Mr. Coley's fifth ground for relief is that the prosecutor tainted his trial on several occasions. He alleges that the State improperly introduced gruesome photographs, victim impact evidence, and evidence to support non-statutory aggravating factors. He also claims that the prosecution improperly questioned victim David Moore. Finally, Mr.

63

Coley asserts that the State improperly commented on his failure to testify during mitigation.

### a.    Prosecutorial Misconduct

To assert a successful prosecutorial misconduct claim in a habeas proceeding it "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)); Durr v. Mitchell, 487 F.3d 423, 439 (6th Cir. 2007).  This question must be answered in light of the totality of the circumstances in the case. Lundy v. Campbell, 888 F.2d 467, 473 (6th Cir. 1989), cert. denied, 495 U.S. 950 (1990).  The prosecutor's comments must be so egregious as to render the trial fundamentally unfair.  Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000).

The Sixth Circuit held in Boyle v. Million, 201 F.3d 711 (6th Cir. 2000), that a district court should first determine whether the challenged statements were, in fact, improper, and if so, to determine whether the comments were "flagrant," thus requiring reversal.  Id. at 717.  Flagrancy is determined by an examination of four factors: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of evidence against the accused.  Mason v. Mitchell, 320 F.3d 604, 635 (6th Cir. 2003)(citing Hill v. Brigano, 199 F.3d 833, 847 (6th Cir. 1999)).

64

**b.**     **Sub-claims (b) and (c) – gruesome photos and victim impact**

Mr. Coley argues in sub-claim (b) that the State's introduction of gruesome photographs tainted his trial. Mr. Coley raises this claim as a trial court error claim in ground for relief seven. The Court will address the merits of this sub-claim when it addresses ground seven. In sub-claim (c), Mr. Coley alleges that the prosecution introduced victim impact evidence and non-statutory aggravating factors. He does not, however, specify when these events occurred during trial. The Court presumes that Mr. Coley refers to two instances he raises in his twelfth ground for relief in the Amended Petition.

Mr. Coley claims that the prosecution made improper comments regarding the victim. He cites to a portion of the trial transcript in which the State gave its closing argument during the culpability phase of trial. The State observed that Ms. El-Okdi was a member of "Take Back the Night," a crime-fighting organization and that she likely felt fear before her death. (Docket # 46, at 2185-6). These statements do not amount to prosecutorial misconduct. They were isolated comments rather than repeated ones. Moreover, there was other compelling evidence that Mr. Coley was involved in the murder of Ms. El-Okdi. It is highly unlikely that these two statements influenced the jury's verdict to convict Mr. Coley of the El-Okdi murder. This claim is not well-taken.

**c.**     **Sub-claim (d) – religion**

Mr. Coley contends that the prosecutor improperly invoked religion to gain sympathy for the victim, David Moore, when he questioned Mr. Moore regarding his religious actions while Mr. Coley and Mr. Green were driving him around in his car. Mr.

65

Moore stated that because he believed his death was imminent, he tried to make peace with God.  The prosecutor thereafter questioned Mr. Moore regarding his religious beliefs and this act in particular:

> Q:  Let's stop here then.  Let me back up.  You say you made your peace with God.  Do you practice a particular religion?
>
> A:  Well I'm a Catholic, and the Act of Contrition is the way of asking God's forgiveness for any sins.
>
> Q:  Is that what you're saying?
>
> A:  I couldn't remember it, so I had to do it in a different way.  I - I remembered part of it, but not all of it.
>
> Q:  Are you doing this out loud [or] to yourself?
>
> A:  To myself.

(Docket # 41, at 1344).

Mr. Coley claims that this exchange between the prosecution and Mr. Moore was designed to prejudice the jury against him.  The above-quoted passage is the extent to which the prosecution questioned Mr. Moore regarding his religious beliefs.  These comments do not constitute a "series of improper statements."  Boyle, 201 F.3d at 717.  Moreover, as a review of the remainder of Mr. Moore's testimony shows, the total strength of evidence against Mr. Coley on these charges is overwhelming.  Even if inappropriate, these prosecution's remarks could not be held to have influenced the jury's verdict on his convictions.  This claim is not well-taken.

### d.    Sub-claim (e) –  failure to testify during mitigation

66

Mr. Coley argues that the prosecutor improperly commented on Mr. Coley's failure to testify during the mitigation phase of trial when he stated that one should "say you're sorry" when you hurt somebody.  (Docket # 48, at 2539).  When read in context, however, it is clear that the prosecutor was attempting to persuade the jury to hold Mr. Coley accountable for his murder despite his youthful age when he stated:

> I don't know if any of you have ever read this book, "All I Really Need to Know I Learned in Kindergarten."  It's really a wonderful little book, and it is by a man, an author who says, you know, that there are just certain basic truisms.  And they're kind of simplistic but even though they're simplistic, it doesn't make them any less true.
>
> Share everything.  Play fair.  Don't hit people.  Put things back where you found them.  Clean up your own mess.  Don't take things that aren't yours.  Say you're sorry when you hurt somebody.
>
> Maybe we need another one: Don't shoot somebody in the head.
>
> These are things that a child knows, let alone somebody who's twenty-one years old.

(Docket # 48, at 2539-40).

This rather flip remark by the prosecutor does not constitute a comment so egregious as to render Mr. Coley's trial fundamentally unfair.  These remarks could have been an attempt to persuade the jury that Mr. Coley's age was not relevant to its sentencing decision.  This sub-claim is not well-taken.

### 6. Trial Court Error: Grounds for Relief 6(a), (b), (c), (d), and (f)

#### a. Sub-claims (a), (b), and (c) – jury instructions, gruesome photos and victim impact

In these sub-claims, Mr. Coley asserts that the trial court erred when it gave improper and conflicting jury instructions, admitted a significant number of gruesome photographs in both phases of the trial, and considered non-statutory aggravating factors and victim impact testimony in its sentencing decision. Mr. Coley asserts each of these sub-claims as distinct grounds for relief elsewhere in the Amended Petition. Specifically, Mr. Coley asserts the grounds for sub-claim (a) in ground for relief fourteen, the grounds for sub-claim (b) in ground for relief seven, and the grounds for sub-claim (c) in ground for relief twelve. The Court will not duplicate its efforts and addresses the bases for these sub-claims when it reviews the aforementioned grounds for relief.

#### b. Sub-claim (d) – recusal of judge

In this sub-claim, Mr. Coley alleges that the trial judge should have recused herself when she became aware of the contents of a letter Mr. Coley sent to one of the State's witnesses. As noted above, the court-appointed defense investigator discovered the existence of a letter that Mr. Coley allegedly authored and sent to his brother, Victor, asking him to get a rifle to Vette's Daddy to "take care of" someone. (Docket #80). The investigator delivered the letter to defense attorney Helmick. Mr. Helmick recognized the ethical dilemma in which he was placed and contacted the Supreme Court of Ohio Board of Commissioners on grievances and discipline for advice. The Board advised Mr. Helmick to disclose the contents of the letter to the trial

judge, Ruth Ann Franks. He did so. Judge Franks then contacted the police and prosecutor's office, which began an investigation. The trial judge thereafter overruled counsel's motion to quash subpoenas, requiring them to furnish the defendant's letter to law enforcement. Defense counsel filed a motion to withdraw as counsel, which the trial judge granted, appointing attorneys Adrien Cimerman and Merle Deck to represent Mr. Coley during trial. Mr. Coley now asserts that newly appointed counsel should have moved, and the trial court should have granted a motion, requesting that the trial judge recuse herself once she became aware of the contents of the letter.

While due process requires that a trial be unfettered by actual judicial bias or the appearance of it, "disqualification of a judge for bias or prejudice is 'constitutionally required' only in the 'most extreme cases.'" Moore v. Mitchell, 531 F.Supp.2d 845, 875 (S.D. Ohio 2008)(quoting Aetna Life Ins. v. Lavoie, 475 U.S. 813, 821 (1986)). The United States Supreme Court recently explained this precept in Caperton v. Massey Coal Co., Inc., – U.S. –, 129 S.Ct. 2252 (2009). There, the Court held that a newly elected state supreme court judge had violated due process when he presided over a case in which one party had contributed substantially to the judge's election campaign. While the Caperton Court confirmed the general principal that most judicial disqualification issues do not rise to a constitutional level, it cautioned that the Constitution would require judicial disqualification in instances where the "probability of actual bias on the part of the judge or decisionmaker is too high . . . ." Id. at 2259 (citation omitted). After conducting an "objective inquiry" into whether the party's contributions would offer a possible temptation to the average judge, the Court held that

69

the amount and temporal proximity of the campaign contribution to the judge presiding over the case constitutionally required the judge's recusal.  Id. at 2264-65.

Although the Caperton Court is instructive because it provides the Court with the most recent standard of review, the factual dissimilarities between Caperton and the instant case diminishes its applicability here.  Instead, the Court finds Gillard v. Mitchell, 445 F.3d 883 (6th Cir. 2006), offers greater guidance.  Similar to Mr. Coley, Mr. Gillard asserted in a capital habeas petition that the trial court was biased and partial because it had presided over an *ex parte* hearing during which the court heard testimony regarding Mr. Gillard's background.[14]  Id.  It observed that the Supreme Court of Ohio had held that, while the trial court erred in refusing to recuse itself, the error was harmless because of the overwhelming evidence of Mr. Gillard's guilt.  Id.  Citing to a previous case in which it had utilized the harmless error standard of review to adjudicate a judicial bias claim, the Gillard Court accepted the Ohio Supreme Court's findings.  Id. at 893 (*citing* Esparza v. Mitchell, 310 F.3d 414, 424 (6th Cir. 2002), rev'd on other grounds, 540 U.S. 12 (2003)).  Additionally, the Court noted that Mr. Gillard could not demonstrate the trial court's actual bias.  Id.  It therefore found Mr. Gillard's claim had no merit.

Even if it was error for Judge Franks to remain on this case once she was aware of the contents of the letter, similar to the Gillard Court, this Court finds that any harm that inured to Mr. Coley by Judge Franks's failure to recuse herself was harmless due

---

[14]     Specifically, the trial court heard that, "Gillard acted as president of the Outlaws motorcycle gang and his brothers had threatened to harm [a State witness], [the witness's] family, and several others if they testified against Gillard in this case."  Id. at 893.

to the overwhelming evidence of Mr. Coley's guilt.  Nowhere does Mr. Coley demonstrate that Judge Franks was actually biased against him.  The record does not reveal any evidence of hostility or bias by Judge Franks towards Mr. Coley during trial or that she was in any way prejudiced by the contents of the letter.  When granting original counsel's motion to withdraw his representation, she stated, " I want you to know, as I indicated, the Court does not place any taint on – on the client, nor the lawyers." (Docket # 40, at 36-7).  This Court does not find that Mr. Coley was denied due process on these grounds.  This sub-claim lacks merit.

### c.    Sub-claim (f) – Catchall Trial Error

In this sub-claim, Mr. Coley asserts a catch-all trial court error claim, contending the trial court erred on numerous occasions "more specifically described elsewhere in the Petition." (Docket # 81, at 27).  Because this sub-claim lacks specificity, the Court cannot address it and finds that it is not well-taken.

### 7.    Gruesome Photographs: Seventh Ground for Relief

Mr. Coley contends that the admission of cumulative, gruesome photographs was unfairly prejudicial and denied him due process and a fair trial.  The trial court admitted, without objection from defense counsel, five photographs of Ms. El-Okdi's body and one autopsy photograph during the culpability phase of trial, and additional photographs during the penalty phase.

The Supreme Court of Ohio reviewed this claim for plain error on direct appeal because defense counsel failed to object to the introduction of the photographs during trial.  It cited state evidentiary rules and quoted controlling state case law regarding the admission of evidence, and photographs in particular.  Coley, 93 Ohio St.3d at 265-66.

71

After examining the evidence, the Supreme Court concluded the claim was meritless, holding that the photos, "illustrated the testimony of detectives and the deputy coroner who saw the crime scene, portrayed El-Okdi's body in relation to her surroundings, * * * [and] helped prove the killer's intent and the lack of accident or mistake." Id. at 266.

The United States Supreme Court has held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" such as evidentiary issues. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 68 (citations omitted); 28 U.S.C. § 2254(a). The job of a federal court addressing state evidentiary issues is limited to a determination whether the admission of evidence at issue violated the petitioner's right to due process and a fair trial. Id. A trial may be deemed fundamentally unfair if it can be shown by a reasonable probability that the outcome would have been different without admission of the evidence or if there is a basis upon which to conclude that the result was unreliable. Lockhart v. Fretwell, 506 U.S. 364, 370 (1993). The Estelle Court noted that the category of infractions that violate fundamental unfairness is a narrow one. Id. (citing Dowling v. United States, 493 U.S. 342, 352 (1990)).

Mr. Coley has not demonstrated that he was denied a fundamentally fair trial because of the introduction of the photographs. Nor does he demonstrate how the Supreme Court of Ohio's opinion that the photographs provide content to the crime scene and prove the killer's intent render his trial fundamentally unfair. Thus, Mr. Coley's seventh ground for relief is not well-taken.

72

### 8.    Incomplete Transcripts: Eighth Ground for Relief

Mr. Coley claims he was denied a fair trial and appeal because the trial court did not record the entire trial proceeding.  He alerts this Court to several sidebar conferences that took place off the record.  Although Mr. Coley asserts that there are additional instances in which the trial court failed to record the proceedings, he provides the Court with no further citations of when these failures occurred.

Rule 22 of the Ohio Rules of Criminal Procedure requires all proceedings to be recorded in all serious offense cases, and Ohio Appellate Rule 9(A) requires, "[i]n all capital cases, the trial proceedings shall include a written transcript of the record made during the trial by stenographic means."  Ohio App. R. 9(A).  When a proceeding has not been preserved, counsel may invoke procedures set forth in Ohio Appellate Rules 9(C) or 9(E) to reconstruct the record.  Under Ohio law, an error is considered waived in the absence of an attempt to reconstruct the substance of the remarks and demonstrate prejudice.  State v. Jells, 53 Ohio St.3d 22 (1990), cert. denied, 498 U.S. 1111 (1991)(citing United States v. Gallo, 763 F.2d 1504, 1529-32 (6th Cir. 1985); State v. Brewer, 48 Ohio St.3d 50 (1990), cert. denied, 475 U.S. 1017 (1986)).

Upon review of the record, it is clear that Mr. Coley was not denied a fair trial.  Mr. Coley has failed to set forth any evidence to support a finding that he was denied a fair trial simply because some sidebar conferences were not placed on the record.  Other than mere assertion, Mr. Coley does not provide the court with specific information that would support a claim that he was prejudiced by the trial court not recording some sidebar conferences or by counsel's failure to request such recording.  A mere assertion is not enough to support a finding that the failure to record these

conferences resulted in an unfair trial.  Lundy v. Campbell, 888 F.2d 467 (6th Cir. 1989).

The United States Supreme Court recently affirmed that, pursuant to a harmless error test, a habeas court must determine whether the alleged error had a "substantial and injurious effect on the verdict."  Frye v. Pliler, 551 U.S. 112, 121-122 (2007)(*citing* Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).  Thus, to obtain habeas relief, a petitioner must establish that the error resulted in "actual prejudice."  Brecht, 507 U.S. at 637 (*citing* United States v. Lane, 474 U.S. 438, 449 (1986)).  Mr. Coley has failed to make such a showing of actual prejudice.  He does not even allege, let alone attempt to substantiate, why a failure to record the sidebar conferences denied him the right to a fair trial.  This claim is not well-taken.

### 9.    Cumulative Error: Ninth Ground for Relief

Mr. Coley asserts that he is entitled to habeas relief based on cumulative errors that occurred during his state court proceedings.  This Court is foreclosed from reviewing these claims pursuant to the strictures of the AEDPA.  In Williams v. Anderson, 460 F.3d 789 (6th Cir. 2006), the Sixth Circuit acknowledged that "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."  Id. at 816 (*citing* Moore v. Parker, 425 F.3d 250, 256 (6th Cir.2005)).  See also Gillard v. Mitchell, 445 F.3d 883, 898 (6th Cir. 2006)(*holding* that while errors might accumulate to produce unfair trial setting, the Supreme Court has never held distinct claims can accumulate to grant habeas relief); Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002), amended on other grounds, 307

74

F.3d 459 (6th Cir. 2002), and cert. denied at, 538 U.S. 947 (2003)(same). Accordingly, Mr. Coley is not entitled to relief for this claim.

### 10. Consideration of Non-Statutory Aggravating Factors: Twelfth Ground for Relief

In his twelfth ground for relief, Mr. Coley claims that the trial court considered non-statutory aggravating factors when formulating its sentencing decision. Specifically, he argues that the trial judge: (a) considered the circumstances of the David Moore incident; (b) considered victim-impact testimony about Ms. El-Okdi; (c) failed to recuse herself from the case even after learning that Mr. Coley threatened a State witness; (d) viewed cumulative gruesome photographs; (e) reviewed a letter from Mr. Coley to his paternal aunt, Marquita Armstrong indicating he knew right from wrong; and, (f) "other claims for relief." (Docket # 81, at 50).

#### a. Sub-claims (c), (d), and (f) – failure to recuse, gruesome photos, catch-all

The Court already addressed the substance of sub-claim (c)(trial court's failure to recuse) and (d)(trial court's admission of cumulative and gruesome photographs) in other claims for relief. The Court reviewed the issue raised in sub-claim (c) when it addressed ground for relief 6(d), supra. Moreover, sub-claim (d) was addressed when Mr. Coley's seventh ground for relief was reviewed. The Court will not re-address those arguments here. Finally, because sub-claim (f) is a catch-all request that does not specify a ground for relief, the Court cannot address this sub-claim.

#### b. Sub-claim (a) – David Moore offenses

In this sub-claim, Mr. Coley argues that the trial court improperly considered evidence used to convict him on the David Moore offenses when it made its sentencing

decision for the El-Okdi conviction.  He notes that the trial court wrote about the Moore offenses in its sentencing opinion.

While Mr. Coley is correct that the trial court made reference to Mr. Moore in its sentencing opinion, it did so when it reviewed the evidence leading to Mr. Coley's arrest and conviction for the El-Okdi kidnapping and murder.  The court noted that Mr. Moore identified Mr. Coley and Mr. Green as his assailants after viewing a television broadcast regarding Ms. El-Okdi's murder.  (Docket # 31, at 393).  The court then commented that the bullets recovered from Mr. Moore and Ms. El-Okdi were both fired from Mr. Coley's gun.  Reciting the similarities of the two crimes, noting that, pursuant to Mr. Moore's depiction of the events that occurred when he was kidnaped, Mr. Coley, rather than Mr. Green was "in command of the events" and that Mr. Coley had shot Mr. Moore.  Id. at 395.  Thus, the court concluded that because of Mr. Moore's description of a similar crime, a confession Mr. Coley made to his cousin while in prison, and the fact that Mr. Coley was in control of the murder weapon at the time of his arrest, Mr. Coley purposely caused the death of Ms. El-Okdi beyond a reasonable doubt.  Id. at 396.

While the trial court commented about the Moore offense, it did so because of its similarity to the El-Okdi murder.  Moreover, it analyzed the evidence adduced at trial to infer that Mr. Coley intended to cause the death of Ms. El-Okdi based on his conduct during the Moore offenses because, the trial court found, the two offenses "mirror[ed] each other."  (Docket # 31. at 394).  The trial court did not specifically consider the Moore offenses as separate, non-statutory aggravating factors when sentencing Mr. Coley.  Thus, the Court finds that the trial court did not err in its sentencing decision.

### c.      Sub-claim (b) – victim impact

Mr. Coley claims that the trial court impermissibly considered victim impact testimony regarding Ms. El-Okdi when it gave its sentencing decision. He cites a portion of the trial transcript in which the State gave its closing argument during the culpability phase of trial. The State observed that Ms. El-Okdi was a member of "Take Back the Night," a crime-fighting organization and that she likely felt fear before her death. (Docket # 46, at 2185-86). Mr. Coley does not explain, however, why he believes that the State's purported use of victim-impact testimony during its closing argument resulted in the trial court's utilization of this testimony in rendering its sentencing decision. Without this critical nexus, this claim must fail.

### d.      Sub-claim (e) – Marquita Armstrong

Mr. Coley asserts that the trial court improperly utilized a letter from his aunt, Marquita Armstrong, when sentencing him. During the mitigation hearing, Ms. Armstrong testified about a letter she received from Mr. Coley in which he indicated that he knew right from wrong. (Docket # 48, at 2509-10). There is no indication, however, that the trial court impermissibly used this testimony in formulating its sentencing decision. In the sentencing opinion, the trial court merely states that Ms. Armstrong, "testified concerning many of the same matters presented by the defense in mitigation. Ms. Armstrong further testified to her own illegal conduct and drug addiction. Ms. Armstrong described her attempts to care for the defendant when the defendant's mother was unable to raise her children." (Docket # 46, at 400). The trial court's summarization of Ms. Armstrong's testimony is not improper. More importantly, it does not appear from the sentencing opinion that the court considered the letter to

Ms. Armstrong authored by Mr. Coley when rendering its sentencing decision. Accordingly, this claim has no merit.

### 11. Consideration of Mitigating Evidence: Ground for Relief Thirteen

Mr. Coley alleges in his thirteenth ground for relief that the jury did not consider critical mitigating evidence such as his school records, employment history, or his childhood. This claim is nearly identical to ground for relief 10(a), in which Mr. Coley asserts ineffective assistance of counsel during the mitigation phase of trial. Because this claim is essentially a re-casting of that claim, the Court will not address it here but reviews the merits of this claim when it addresses claim 10(a), infra.

### 12. Improper Jury Instructions: Ground for Relief Fourteen

In Mr. Coley's fourteenth ground for relief, he maintains that the trial court erred when charging the jury on several occasions during both phases of the trial. The Court will examine these claims individually, in light of the fact that an incorrect jury instruction does not warrant federal habeas corpus relief if it was merely undesirable, erroneous, or universally condemned. Instead, the instruction must violate a constitutional right. Estelle v. McGuire, 502 U.S. 62, 72 (1991). On habeas review, a court must determine whether there is a reasonable likelihood that the jury applied the instruction in a way that prevented consideration of constitutionally relevant evidence. Boyd v. California, 494 U.S. 370, 380 (1990). The impropriety of the instruction must be considered in the context of the instructions as a whole and of the entire trial record. Id.

Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional error in a habeas proceeding

"is even greater than the showing required to establish plain error on direct appeal."

Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given . . . .  An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Id. at 155.  The Court now turns to Mr. Coley's individual sub-claims for relief.

### a.  Sub-claim (a) – sympathy consideration

Mr. Coley asserts that the trial court improperly admonished the jury not to consider sympathy presumably when formulating its sentencing decision. Consequently, Mr. Coley argues, the jury could show no mercy for him.

> At the conclusion of the mitigation hearing, the court cautioned the jury:

> Now, ladies and gentlemen, you must not be influenced by any consideration of sympathy or prejudice.  It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings and to render your verdict accordingly.

> In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality and without bias, sympathy or prejudice, so that the State of Ohio and the defendant Douglas Coley will feel that their case was fairly and impartially tried.

(Docket # 48, at 2558).  Mr. Coley maintains that the court's proscription against considering sympathy prevented the jury from forming an individualized sentencing decision or basing that decision on mercy for him.

A death-sentenced defendant made a similar argument in California v. Brown, 479 U.S. 538 (1987), asserting that an instruction preventing the jury from being swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or

79

public feeling" was unconstitutional.  Id. at 542.  The Supreme Court rejected this argument, holding that  "[e]ven a juror who insisted on focusing on [the phrase 'mere sympathy'] in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase."  Id.  Because the Brown holding squarely addresses this issue and finds that it lacks merit, Mr. Coley's claim is not well-taken.

**b.     Sub-claim (b) – "principal offender" instruction**

Mr. Coley argues that the trial court provided the jury with an improper instruction regarding the definition of "principal offender."  He does not specify, however, why this instruction is constitutionally infirm.  During trial, the court defined this term as follows:

> If you find the defendant guilty of aggravated murder in Count 4, you will further determine whether the defendant Douglas Coley committed the aggravated murder in Count 4 while the defendant was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnaping or aggravated robbery, and either Douglas Coley was the principal offender in the commission of the aggravated murder, or, if not the principal offender, committed the aggravated murder with prior calculation and design.
>                                   * * *
> I have used the word principal offender.  Principal offender means that the defendant is found to have been the absolute perpetrator of the crime, that is, Douglas Coley fired the shot that directly produced the death of Samar El-Okdi.

(Docket # 47, at 2279-80).  Mr. Coley does not assert, and the Court does not find, that this instruction violates any federal constitutional right.  Thus, this sub-claim has no merit.

80

c.    Sub-claim (c) – "prior calculation and design" instruction

Mr. Coley contends that the trial court improperly instructed the jury regarding the definition of "prior calculation and design."  On direct appeal, the Supreme Court of Ohio analyzed this claim for plain error.  It found that this claim had no merit:

> In discussing proposition III, Coley argues that "the trial court defined prior calculation as the offender's purpose to cause death."  However, the court's instructions did not equate purpose with prior calculation and design, nor did the instructions confuse these separate elements. For example, the court stated:
>
> "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. To do an act purposefully is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct."
>
> In contrast, the court explained and defined prior calculation and design differently. The court instructed:
>
> "Prior calculation and design means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means and/or instrument with which to cause the death of another.
>
> "To constitute prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must lapse * * *, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient."
>
> The trial court used separate terms to explain prior calculation and design, such as "a definite process of reasoning in advance," a "mental plan involving studied consideration of the method and the means," "planning of an act of homicide," and a "scheme designed to carry out the calculated decision." The court also noted that acting on the "spur of the moment" was not sufficient.

81

> These instructions, consistent with Ohio Jury Instructions, did not confuse these separate elements. See 4 Ohio Jury Instructions (1997 and Supp. 2000), Section 503.01. Nor did these instructions serve to direct a verdict on prior calculation and design as Coley claims. Coley's claim that the trial court confused purpose or intent with prior calculation and design lacks merit. Moreover, this court has previously rejected such claims. See State v. Jones (2001), 91 Ohio St.3d 335, 348; State v. Campbell (2000), 90 Ohio St.3d 320, 341. Therefore, we reject Coley's third proposition.

State v. Coley, 93 Ohio St.3d 253, 267 (2001).  Mr. Coley cannot demonstrate, as he must to prevail on this claim, that the trial court equated prior calculation and design with purpose in its jury instructions.  Accordingly, this claim is not well-taken.

### d.    Sub-claim (d) – unconstitutional aider/abettor instruction

Mr. Coley asserts that the trial court's aider and abettor instruction is unconstitutional.  As with his previous claim, he fails to explain why the trial court's instruction entitles him to habeas relief.  When providing the definition of these terms, the trial court stated, "Aid means to help, assist, or strengthen.  Abet means to encourage, counsel, incite, or assist." (Docket # 47, at 2239).  The Court sees no infirmities in these definitions. This claim has no merit.

### e.    Sub-claim (e) – reasonable doubt instructions

Mr. Coley's final jury instruction claim pertains to the reasonable doubt charge the trial court provided to the jury.  This claim is without merit.  The Sixth Circuit has found that Ohio's statutory definition of reasonable doubt, the definition supplied by the Coley trial court, is constitutional.[15] Byrd v. Collins, 209 F.3d 486, 527 (6th Cir.

---

[15]    That statute reads:

> "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say

2000)(*citing* Thomas v. Arn, 704 F.2d 865, 867-69 (6th Cir. 1983)).  To offend due

process, the instruction must be of the type that could mislead the jury into finding no

reasonable doubt when in fact there was some.  Holland v. United States, 348 U.S.

121, 140 (1954); Thomas, 704 F.2d at 868.  In the present case the trial court merely

read the statutory jury instruction that has been found constitutional.  The instruction,

thus, cannot be considered misleading.

### 13.  Improper Standard of Review: Ground for Relief Sixteen

Mr. Coley argues that the Supreme Court of Ohio did not apply the proper

harmless error standard on direct appeal.  He claims the court did not address the

cumulative impact of errors that occurred during the trial but merely addressed each

claim he raised on an individual basis.  Mr. Coley asserts that this error entitles him to

habeas relief.

The United States Supreme Court has held that trial court error is not tantamount

to reversible error "if the prosecution can prove beyond a reasonable doubt that a

constitutional error did not contribute to the verdict."  Satterwhite v. Texas, 486 U.S.

249, 256 (1988)(*citing* Chapman v. California, 386 U.S. 18 (1967)).  If error occurred,

but without constitutional significance, then the error is deemed harmless and the

---

> they are firmly convinced of the truth of the charge.  It is a doubt
> based on reason and common sense.  Reasonable doubt is not
> mere possible doubt, because everything relating to human affairs
> or depending on moral evidence is open to some possible or
> imaginary doubt.  "Proof beyond a reasonable doubt" is proof of
> such character that an ordinary person would be willing to rely and
> act upon it in the most important of his own affairs.

Ohio Rev. Code § 2901.05(D).

verdict sound.  Id.  The Supreme Court also has found that the test for determining whether the error has constitutional significance, or should be considered "harmless," requires a reviewing court to ascertain whether "the error had [a] substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946))(internal quotation marks omitted).  When a reviewing court is in "grave doubt" or equipoise about whether or not the error is harmless, the court must conclude that the error affected the jury's verdict.  O'Neal v. McAninch, 513 U.S. 432, 435 (1995).

Mr. Coley does not specify on which claims the Supreme Court of Ohio erroneously performed a harmless error test or why any such review is clearly contrary to the holdings of Satterwhite, Brecht, or O'Neal.  Without this pertinent information, the Court finds this claim too vague to address.

### 14.  Post-conviction Relief a Meaningless Review: Ground for Relief Seventeen

Mr. Coley claims that the Ohio post-conviction review system is a "meaningless ritual" both because his appointed counsel failed to file a petition on his behalf and because of Ohio decisional law that has limited the types of claims a post-conviction petitioner may raise in a petition.

The Court declines to address the merits of Mr. Coley's claim because he fails to articulate any infringement for which a federal habeas corpus court can grant relief.  Kirby v. Dutton, 794 F2d 245 (6th Cir. 1986).  Although "the result of the habeas petition need not necessarily be reversal of the conviction . . . the petition must directly dispute the fact or duration of the [petitioner's] confinement."  Id. at 248 (citation omitted).

84

Moreover, as the Court discusses infra, Mr. Coley has no constitutional right to post-conviction counsel.  Pennsylvania v. Finley, 481 U.S. 551, 555 (1987).   Thus, because there is no constitutional right to counsel in post-conviction proceedings, court appointed counsel's failure to file a post-conviction relief petition is not a ground for habeas relief.  Moreover, because Mr. Coley's claim does not dispute the fact or duration of his conviction or sentence, the Court could not provide him habeas relief on this issue in any event.  Consequently, the seventeenth ground for relief is not well-taken.

### 15.    Aggravating Circumstances Did Not Outweigh Mitigating Factors: Ground for Relief Nineteen

In this ground, Mr. Coley asserts that Ohio's death penalty scheme is unconstitutional because it permits a jury to sentence a criminal defendant to death even if the aggravating factors outweigh the mitigating circumstances by the slightest amount.  Moreover, he claims that but for the evidence regarding the Moore offenses, the jury would not have sentenced him to death.

The Court finds that neither of these assertions has merit.  The United States Supreme Court rejected an argument similar to Mr. Coley's first argument in Blystone v. Pennsylvania, 494 U.S. 299 (1990).  In that case, the defendant challenged the constitutionality of the Pennsylvania death penalty statutes, which, similar to Ohio's, requires that the jury impose the death penalty if the aggravating circumstances outweigh the mitigating factors.  In upholding this statutory scheme, the Blystone Court determined that the statutes were constitutional because they permitted the sentencer "to consider and give effect to any mitigating evidence relevant to a defendant's

background and character or the circumstances of the crime." Id. at 304–5 (quoting Penry v. Lynaugh, 492 U.S. 302, 328 (1989))(internal quotation marks omitted).

Moreover, the Court finds that Mr. Coley's second claim has no merit.  Other than bald assertion, Mr. Coley does not explain why he believes that evidence of the Moore offenses was the sole factor in his receiving the death sentence.  A review of the record reveals that, contrary to Mr. Coley's assertion, the evidence surrounding the murder of Ms. El-Okdi was sufficient to impose the death penalty pursuant to Ohio law.

### 16.    Improper Burden Shifting: Ground for Relief Twenty

Mr. Coley asserts that Ohio's death penalty scheme is unconstitutional because the defendant must prove mitigating factors by a preponderance of evidence.  He claims that this amounts to improper burden shifting in violation of the holding in In re Winship, 397 U.S. 358 (1970).  This argument was specifically rejected in Walton v. Arizona, 497 U.S. 639, 649–50 (1990).  There, the United States Supreme Court held that a death penalty scheme requiring the defendant to establish mitigating factors by a preponderance of evidence is constitutionally acceptable burden shifting.[16]

---

[16]    This aspect of the Walton holding is unaltered by the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002).  In that case, the Court overruled Walton because it found Walton irreconcilable with Apprendi v. New Jersey, 530 U.S. 466 (2000), a case in which the Court held that the Sixth Amendment does not permit a judge to impose a sentence that would exceed the maximum sentence to which the defendant would be exposed if punished pursuant to the facts found by the jury.  Thus, because Walton found Arizona's capital sentencing constitutional even though it permitted a judge alone to find aggravating factors and impose a death sentence, the Court in Ring overruled it.  The Court limited its holding, however, overruling Walton only "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty."  Ring, 536 U.S. at 609.  Consequently, the portion of Walton finding it permissible to

86

### 17. Ohio Statutes Fail to Narrow the Class of Death-Eligible Defendants: Ground for Relief Twenty-One

Mr. Coley asserts that Ohio's capital punishment scheme is unconstitutional because it fails to narrow the class of death-eligible defendants. The Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty. In Lockett v. Ohio, 438 U.S. 586 (1978), the Court held that any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant. Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence. Id. at 605. The Court further refined the statutory limiting requirement in Zant v. Stephens, 462 U.S. 862 (1983). In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible. Id. at 877. Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase. Lowenfield v. Phelps, 484 U.S. 231, 246 (1987).

Ohio's death penalty scheme complies with these mandates. First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all

_____

require defendants to establish mitigating factors by a preponderance of evidence remains intact.

87

statutorily enumerated mitigating factors.  Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute. Finally, the Ohio death penalty scheme satisfies the Zant requirements by demanding that the fact finder find the existence of at least one aggravating circumstance set forth in § 2929.04(A).

**F.**    **Merit Review of Non-Defaulted Claims**

 **1.**    **Ineffective Assistance of Trial Counsel: Grounds for Relief 4(g), (h), (i), (j), (k), (l), and (m)**

Mr. Coley first raised the claims listed above in his application to reopen direct appeal.  The Respondent alleges that these claims are properly preserved for habeas review.  Thus, the Court will review them on the merits pursuant to Strickland v. Washington, as detailed supra.

 **a.**    **Sub-claim (g) – indictment lacked elements of specific intent**

Mr. Coley alleges that the indictment did not contain all of the elements necessary to charge him with capital murder.  Specifically, Mr. Coley alleges that the indictment failed to state that he had the "specific intent to cause the death of another" as is required by Ohio statute.  He cites to Ohio Revised Code § 2903.01(E) to support his claim.  Mr. Coley alleges that, pursuant to the law existing at the time of his indictment, he was "not properly charged with having the specific intent to cause the death of another."  (Docket # 84, at 71).

Based on Ohio law at the time of trial, a person could only be convicted of aggravated murder if he or she intended to cause the death of another.  That aggravated murder statute reads in pertinent part:

88

(E) No person shall be convicted of aggravated murder unless the person is specifically found to have intended to cause the death of another . . . . In no case shall a jury in an aggravated murder case be instructed in such a manner that it may believe that a person who commits or attempts to commit any offense listed in division (B) of this section is to be conclusively inferred, because the person engaged in a common design with others to commit the offense by force and violence or because the offense and the manner of its commission would be likely to produce death . . . .  If the jury in an aggravated murder case is instructed that a person who commits or attempts to commit any offense listed in division (B) of this section may be inferred, because the offender engaged in a common design with others to commit the offense by force or violence or because the offense and the manner of its commission would be likely to produce death . . . , the jury also shall be instructed that the inference is inconclusive, that the inference may be considered in determining intent, that it is to consider all evidence introduced by the prosecution to indicate the person's intent and by the person to indicate the person's lack of intent in determining whether the person specifically intended to cause the death of the person killed . . . and the prosecution must prove the specific intent of the person to have caused the death . . . beyond a reasonable doubt.

1997 Bulletin # 4, Ohio Rev. Code Ann., § 2903.01(E)(current version at Ohio Revised Code § 2903.01).

Mr. Coley was re-indicted for capital murder on 10 March 1997.  The indictment states that Douglas Coley was charged with ". . . AGGRAVATED MURDER -

89

§ 2903.01(A) and . . . [two counts of] § 2903.01(B)," both with specifications.[17]  (Docket # 29, at 67).

A federal habeas court cannot provide redress for state law violations, nor does it act as a tertiary level of appellate review after a defendant's direct appeal and post-convictions relief motions.  Allen v. Morris, 845 F.2d 610, 614 (6th Cir. 1988), cert. denied, 499 U.S. 1011 (1989).  To grant a petitioner habeas corpus relief, a federal habeas court must find a violation of the Constitution, laws or treaties of the United States.  28 U.S.C. § 2241; Pulley v. Harris, 465 U.S. 37, 41 (1984).  Thus, this Court need only consider whether the faulty indictment violated federal law.

To be on firm constitutional ground, an indictment must pass a two-part test:

> [F]irst, the indictment must set out all of the elements of the charged offense and must give notice to the defendant of the charges he [or she] faces; second, the indictment must be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts.

United States v. Martinez, 981 F.2d 867, 872 (6th Cir. 1992)(citing Russell v. United States, 369 U.S. 749, 763-64 (1962)).    In light of the fact that "the state legislature's definition of the elements of the offense is usually dispositive,"  Hoover v. Garfield

---

[17]  The aggravated murder statute cited in the indictment defines aggravated murder and states in relevant part:
> (A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.
> (B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape.

Ohio Rev. Code § 2903.01(A).

90

Heights Mun. Court, 802 F.2d 168, 173 (6th Cir. 1986), the Court concludes that Mr. Coley's indictment passes constitutional muster. Although the indictment merely referred to the Ohio statute defining aggravated murder, rather than setting out each element of the eight-count indictment, its reference to the statutes under which each charge arose was sufficient to put Mr. Coley on notice of the offenses charged and would permit him to plead a double jeopardy defense if he were subsequently charged with these offenses.

Additionally as stated above, the jury was, in accordance with the statute, properly instructed about the inferences they could make about Mr. Coley's intent to kill. As the Supreme Court of Ohio found on direct appeal, the jury was properly charged that they could, but were not required to, find that Mr. Coley killed with specific intent based on the circumstances of the crime. Thus, Mr. Coley was not prejudiced by any defects in the indictment. Accordingly, he cannot show that trial counsel were ineffective for failing to object to its contents. Strickland, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."). This sub-claim is not well-taken.

### b.    Sub-claim (h) – removal of trial judge

Mr. Coley contends in this sub-claim that trial counsel failed to file a motion to remove the trial judge on the grounds that she was biased. The Court addressed the underlying basis for relief of this claim in ground for relief 6(d) and found that it is without merit. Thus, Mr. Coley cannot prove, as he must under Strickland, that counsel's inactions prejudiced the outcome of his trial.

91

### c.  Sub-claim (i) – victim impact

In this sub-claim, Mr. Coley alleges that counsel were inadequate because they failed to object to the victim impact testimony provided by State witnesses Susan Postal, Raymond Sunderman, Jill Driscoll, Chris Neal, Megan Mattimoe, and Ilse Knecht during the culpability phase of trial.  Their testimony, he contends, caused the jury to become biased against him.

The Constitution provides no bar to admitting victim impact statements during the sentencing phase of a trial.  The Supreme Court has held "that if the state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar."  Payne v. Tennessee, 501 U.S. 808, 826 (1991).  The Payne Court further opined that "[t]here is nothing unfair about allowing the jury to bear in mind [the victim's family's] harm at the same time as it considered the mitigating evidence introduced by the defendant."  Id.

Mr. Coley maintains that the State introduced, and defense counsel failed to object to, the introduction of victim impact evidence during the culpability phase.  Thus, if the prosecutor adduced and the trial court permitted the use of victim impact testimony during that phase of the trial, Payne may not control the issue Mr. Coley raises.

A review of the transcript depicting the testimony of the State witnesses, however, reveals that this claim lacks merit.  These witnesses did not provide victim impact testimony.  While some of them may have testified regarding the details of Ms. El-Okdi's life, these facts were elicited to establish how the witnesses knew Ms. El-Okdi or the events surrounding her disappearance and Mr. Coley's subsequent arrest.  For

92

example, Megan Mattimoe testified during trial that she knew Ms. El-Okdi because they worked together at the Center for Choice in Toledo.  After establishing her acquaintance with Ms. El-Okdi, the prosecutor then elicited testimony from Ms. Mattimoe that she spotted two men driving Ms. El-Okdi's car, which she recognized by a distinctive dent and bumper sticker.  She followed the car and contacted police to tell them where the men had parked it.  (Docket # 42, at 1560-1580).  The Court finds Mr. Coley's characterization of these witnesses' testimony as victim-impact testimony is inaccurate.  His contention that counsel were ineffective for failing to object to this testimony is without merit as well.

### d.   Sub-claim (j) – indictment lacked elements of specific intent

Mr. Coley alleges trial counsel's ineffectiveness for failing to move for a judgment of acquittal on the aggravated murder charges because the indictment did not contain the elements of specific intent.  This claim is substantially similar to sub-claim (g), above, on this ground for relief.  The Court will not readdress it here.

### e.   Sub-claims (k) and (l) – ineffectiveness of counsel regarding prosecutorial misconduct

In these grounds for relief, Mr. Coley argues that trial counsel should have objected to the prosecution's statements that Ms. El-Okdi did good deeds and that she must have felt fear when she was abducted prior to her murder.  The Court addressed the factual underpinnings of this ineffective assistance of counsel claim as a prosecutorial misconduct claim in grounds for relief 5(b) and (c).  Because it found those sub-claims to be without merit, it necessarily follows that Mr. Coley cannot prove

93

the prejudice he must to assert a successful ineffective assistance of counsel claim.

Thus, these claims are not well-taken.

### f.  Sub-claim (m) – failure to object to instructions

Mr. Coley asserts that the trial court somehow relieved the State of its burden of proof with its definition of "specific intent" and "purpose." He claims counsel were ineffective for failing to object to these instructions. He does not, however, elaborate about why these instructions were constitutionally infirm and how they misled the jury regarding the State's burden of proof.

On each count of aggravated murder, the trial court charged the jury as follows:

> When the essence or gist of an offense is a prohibition against or forbidding the conduct of a certain nature, a person acts purposely if his specific intention was to engage in conduct of that nature regardless of what he may have intended or intended to accomplish by his conduct.

(Docket # 47 at 2274; 2286; 2296).  Moreover, the trial court expressly defined the term "purposely" under Ohio law when it charged the jury:

> I have used the word purposely.  Purpose to cause the death of Samar El-Okdi is an essential element of the crime of aggravated murder.  A person acts purposely when it is his specific intention to cause a certain result.  It must be established in this case that at the time in question there was present in the mind of the defendant Douglas Coley a specific intention to cause the death of Samar El-Okdi.

Id. at 2274.  These statements are accurate instructions of the terms as defined under Ohio law.  Because neither of the trial court's instructions render Mr. Coley's trial fundamentally unfair, his counsel were not unreasonable for failing to object to them.

Accordingly, this claim is not well-taken.

94

2.   **Prosecutorial Misconduct: Ground for Relief 5(a) – inconsistent state theories**

In this sub-claim, Mr. Coley asserts that the prosecution acted improperly when it used inconsistent theories of criminal culpability to convict both he and his co-defendant, Joseph Green.  Mr. Green and Mr. Coley were tried separately.  Mr. Green, who was tried first, was convicted before a three-judge panel and sentenced to death.[18] During Mr. Green's trial, the State argued that he was the principal offender.  In Mr. Coley's subsequent trial, the State asserted that it was Mr. Coley who was the principal offender.  Mr. Coley alleges the State's use of inconsistent theories of liability entitles him to habeas relief.

The United States Supreme Court has held that an Ohio death row inmate was not entitled to habeas relief because the State had inconsistently argued that both he and his co-defendant were the triggerman in a robbery-murder.  Bradshaw v. Stumpf, 545 U.S. 175 (2005).  There, the petitioner asserted that the State's use of inconsistent theories to convict both he and his co-defendant of aggravated murder rendered his guilty plea involuntary.  The petitioner sought habeas relief on this basis but the district court denied relief.  Stumpf v. Anderson, No. C-1-96-668, 2001 WL 242585 (S.D. Ohio Feb. 7, 2001).  The Sixth Circuit reversed, holding that the prosecutor's use of two conflicting theories concerning the identity of the shooter to convict both the petitioner and his co-defendant of aggravated murder violated the petitioner's right to due process.  Stumpf v. Mitchell, 367 F.3d 594 (6th Cir. 2004).

---

[18]   As stated above, Mr. Green's death sentence was later overturned by the Supreme Court of Ohio.  State v. Green, 90 Ohio St.3d 352 (2000).

95

The United States Supreme Court granted certiorari and reversed the Sixth Circuit's opinion.  It held that, pursuant to Ohio law, aiders and abettors are equally in violation of the aggravated murder statute if the murder was committed with the specific intent to cause death.  Stumpf, 545 U.S. 175, 184 (citing In re Washington, 81 Ohio St.3d 337 (1998); State v. Scott, 61 Ohio St.2d 155, 165 (1980))(parallel citations omitted).  Thus, it reasoned that both men could be found guilty of aggravated murder regardless of who was the actual killer.  The Stumpf Court concluded that the identity of the triggerman was immaterial to the petitioner's conviction for aggravated murder and did not render his guilty plea involuntary.[19]  Id. at 184.

The Stumpf holding forecloses Mr. Coley's claim.  Because the Stumpf Court analyzed the claim pursuant to Ohio law, its holding is directly applicable here.  As Ohio law permits an aider and abettor to be convicted of aggravated murder if the jury finds that he or she also had the requisite intent to kill, both Mr. Coley and Mr. Green could have been convicted of aggravated murder regardless of who actually shot Ms. El-Okdi.  Accordingly, Mr. Coley's assertion that the State's use of inconsistent theories in arguing that both he and Mr. Green were the triggerman does not violate his right to due process.  The prosecution's use of these theories was not improper.

---

[19]    The Stumpf Court was not as unequivocal about the effect that inconsistent theories of guilt may have had on the petitioner's sentence because the sentencer may have considered the petitioner's role in the murder when sentencing the defendant.  Because Mr. Coley does not raise that issue in the Amended Petition, however, the Court refrains from applying that aspect of the Stumpf holding to Mr. Coley's ground for relief.

3. **Trial Court Errors:  Grounds for Relief 6(e) and (g) – transcripts and severing counts**

  a. **Sub-claim (e) – transcripts**

Mr. Coley alleges that the trial court erred because it refused to furnish him with transcripts of the grand jury testimony.  As stated above, Mr. Coley's first indictment for murder was dismissed.  He was then re-indicted on capital murder charges.   On direct appeal, Mr. Coley asserted that his re-indictment constituted the "particularized need" necessary under Ohio law to unseal the grand jury transcripts.  The Supreme Court of Ohio disagreed as it held:

> Coley recognizes that "[g]rand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." State v. Greer (1981), 66 Ohio St.2d 139, paragraph two of the syllabus. Also, "[w]hether particularized need for disclosure of grand jury testimony is shown is a question of fact * * *." Id., paragraph three of the syllabus. Moreover, whether to release grand jury testimony "is within the discretion of the trial court." Id., paragraph one of the syllabus. A decision to deny release will not be reversed absent an abuse of discretion. State v. Brown (1988), 38 Ohio St.3d 305.

> Coley argues that he demonstrated a particularized need because the grand jury indicted Coley for the Moore and El-Okdi offenses in a noncapital indictment issued in January 1997. In March 1997, the prosecutor resubmitted the case, and another grand jury issued a capital indictment against Coley. Coley was then tried on those new charges.

> However, the trial court rejected Coley's argument that a capital indictment had improperly replaced the earlier noncapital indictment. At the trial court hearing on the issue, Coley agreed that the fact that he had been reindicted did not show a particularized need. Further, Coley agreed that he did not claim that prosecutorial vindictiveness was involved.

> At the hearing Coley showed that some police officers were unhappy that the first indictment was for noncapital offenses and expressed their thoughts to a newspaper reporter. Thereafter, a Toledo Blade editorial questioned why Coley and Green had not been indicted on capital

offenses. Police investigated further and secured additional evidence, which was presented to a second grand jury. A second indictment is not an uncommon procedure, as evidence frequently comes to light after an initial indictment.

This new evidence presented to a second grand jury demonstrated that El-Okdi had been kidnapped and robbed. Three witnesses who had not testified before the first grand jury testified before the second grand jury. Among the three was Frusher, who had heard shots and had seen El-Okdi's car, along with two suspects, near West Grove Place at about 8:35 p.m. on January 3. At that location, police found El-Okdi's body on January 7. Also, new evidence showed that El-Okdi's purse was missing.

Thus, Coley failed to show a particularized need for the grand jury testimony. The subsequent capital indictment was based on additional investigation and new evidence, not on improper motives such as placating a newspaper or police department.

In previous cases, this court has rejected similar generalized claims attempting to violate the sanctity of grand jury secrecy. For example, in State v. Benge (1996), 75 Ohio St.3d 136, Benge argued that something improper occurred in the grand jury because "he was bound over on charges of murder and theft but indicted" on capital charges. The Benge court ruled, however, that his indictment "on elevated charges" did not show any particularized need and thus rejected arguments similar to those that Coley makes.

In State v. Brown, 38 Ohio St.3d at 308, the court held that a trial court did not abuse its discretion when it found no particularized need based on defense claims that the indictment was issued on insufficient evidence. See, also, State v. Mack (1995), 73 Ohio St.3d 502, 508, (claims that a witness "fabricated his story to conceal his own involvement" were not sufficient); State v. Davis (1988), 38 Ohio St.3d 361(claims that indictment was based on "illegal and incompetent evidence" did not establish particularized need). See, also, State v. Stojetz (1999), 84 Ohio St.3d 452, 459-460; State v. Webb (1994), 70 Ohio St.3d 325, 336-337.

Finally, a presumption of regularity supports prosecutorial decisions such as the decision in this case to present additional evidence to another grand jury. See United States v. Armstrong (1996), 517 U.S. 456, 464; Bordenkircher v. Hayes (1978), 434 U.S. 357.  In sum, Coley has not demonstrated that the trial court abused its discretion in refusing to release a record of grand jury proceedings. Accordingly, we overrule Coley's twelfth proposition.

98

State v. Coley, 93 Ohio St.3d 261-63 (parallel citations omitted).

This claim involves Mr. Coley's ability to demonstrate a "particularized need" to unseal the grand jury transcripts under Ohio law.  The Supreme Court of Ohio did not identify or analyze this claim according to any United States Supreme Court precedent because Mr. Coley's claim was a state law issue.  The Supreme Court of Ohio did correctly identify United States v. Armstrong and Bordenkircher v. Hayes as controlling United States Supreme Court precedent standing for the proposition that there is a presumption of regularity in prosecutorial decisions such as the decision to present new evidence to a grand jury.  Nothing contained in the Supreme Court of Ohio's opinion is contrary to or an unreasonable application of United States Supreme Court precedent because, as the Supreme Court of Ohio observed, Mr. Coley did not demonstrate beyond mere suspicion that the prosecution re-indicted him because of the Blade articles.   Thus, the Armstrong and Bordenkircher presumptions of regularity apply, as the Supreme Court of Ohio held.  This claim is not well-taken.

### b.    Sub-claim (g) – failure to sever counts

Mr. Coley contends that the trial court erred when it failed to sever the counts in the indictment involving Mr. Moore from those counts involving Ms. El-Okdi.  He raised this claim on direct appeal but the Supreme Court of Ohio found that no prejudice inured to him based on the trial court's failure to sever.  It reasoned as follows:

> In proposition XI, Coley argues that the trial court erred by joining for trial, over defense objection, unrelated offenses, namely the December 1996 offenses against Moore and the January 1997 charges relating to the aggravated murder of Samar El-Okdi.
>
> "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " State

99

v. Lott (1990), 51 Ohio St.3d 160, quoting State v. Torres (1981), 66 Ohio St.2d 340, 343. Under Crim.R. 8(A), offenses that are based on acts "connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct" may also be joined.

Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder" a court may grant a severance under Crim.R. 14. However, the defendant bears the burden to prove prejudice and that the trial court abused its discretion in denying severance. State v. Torres, 66 Ohio St.2d 340, syllabus.

"A prosecutor can use two methods to negate such claims of prejudice," as noted in State v. Lott, 51 Ohio St.3d at 163. First, if one offense would have been admissible under Evid.R. 404(B), no prejudice could have resulted from joinder. "To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question." State v. Lowe (1994), 69 Ohio St.3d 527, paragraph one of the syllabus. See, also, State v. Smith (1990), 49 Ohio St.3d 137.

Here, the Moore offenses were admissible under Evid.R. 404(B) to prove Coley's identity as El-Okdi's killer. The similarities between the offenses were remarkable. The carjack victims, El-Okdi and Moore, lived within a block of each other, and both were abducted within two weeks of each other at roughly the same time of day, between 7:30 and 8:15 p.m. Both victims were driven to a nearby secluded area, robbed of money, shot using the same gun, and then left to die alone. Green and Coley drove each car for several days after placing plates stolen from a similar car on the stolen car.

The court has upheld the use of similar other-acts evidence in comparable cases. See, e.g., State v. Green (2000), 90 Ohio St.3d 352, 369 (same facts, Coley's accomplice Joseph Green); State v. Bey (1999), 85 Ohio St.3d 487, 490 (businessmen stabbed in chest with knife, and shoes and trousers removed); State v. Woodard (1993), 68 Ohio St.3d 70, 73 (carjacking attempt to prove identity as to later carjacking and murder); State v. Jamison (1990), 49 Ohio St.3d 182, 183-187 (similar strong-arm robberies of stores). See, also, State v. Watson (1971), 28 Ohio St.2d 15, 19-22 (proof of other criminal acts allowed to prove possession of murder weapon); State v. Martin (1985), 19 Ohio St.3d 122, 127 (proof of theft of victim's weapon allowed to prove possession of murder weapon).

Furthermore, the state can separately negate prejudice by showing that "evidence of each crime joined at trial is simple and direct. * * * Thus, when simple and direct evidence exists, an accused is not prejudiced by

100

joinder regardless of" whether the evidence is admissible as other-acts evidence. Lott, 51 Ohio St.3d at 163. See, e.g., State v. Johnson (2000), 88 Ohio St.3d 95, 109-110 (assaults against female neighbors); State v. Franklin (1991), 62 Ohio St.3d 118 (burglaries in same neighborhood). In Coley's case, the proof of each offense was separate and distinct. The jury was not likely to be confused as to which evidence proved that Coley had attempted to murder Moore and which proved that he had murdered El-Okdi.

Here, the state satisfied both tests, either of which was sufficient to negate Coley's claims of prejudice. "Simple and direct" evidence was involved, and the evidence was admissible in any event as other-acts evidence. In comparable circumstances the court has approved joinder of offenses. In State v. Williams (1995), 73 Ohio St.3d 153, 158, the court allowed a single trial of different robberies when the same gun was apparently used to kill a cab driver and assault a truck driver. In State v. Mills (1992), 62 Ohio St.3d 357, 362, the court approved joinder for separate robberies, three months apart, against different bank branches. See, also, State v. Lott, 51 Ohio St.3d at 163.

Finally, the trial court provided a limiting instruction to the jury during the guilt phase on the limited use of the Moore evidence to prove Coley's identity as El-Okdi's killer. The trial court also instructed the jury in the penalty phase regarding the specific aggravating circumstances that the jury was to consider in imposing punishment for El-Okdi's aggravated murder. Cf. State v. Waddy (1992), 63 Ohio St.3d 424, 428. Moreover, Coley never objected to the instructions, nor did he claim that the jury was confused about the relevance of the Moore offenses. Accordingly, we find no merit to Coley's eleventh proposition of law and overrule it.

State v. Coley, 93 Ohio St.3d at 1139-40 (parallel citations omitted). The Supreme Court of Ohio cogently analyzed Mr. Coley's claim pursuant to Ohio law. Mr. Coley does not assert, and this Court does not find, anything in the decision that is clearly contrary to or an unreasonable application of any United States Supreme Court precedent. This finding is not surprising given that this claim deals with issues of state law.[20] Thus, this Court's inquiry ends. This sub-claim is not well-taken.

---

[20]  Although there is no United States Supreme Court precedent directly on point, the Eighth Circuit Court of Appeals held in a pre-AEDPA case that

4.    **Ineffective Assistance of Counsel During Mitigation: Grounds for Relief 10(a), (b), (c), (d), and (e)**

a.    **Sub-claim (a) – mitigation**

Mr. Coley asserts in this sub-claim that his counsel failed to present important mitigating evidence during the penalty phase of trial.  He claims that counsel did not present any of Mr. Coley's school records, his employment history, or evidence concerning his background or upbringing during the mitigation hearing.  Thus, he asserts he is entitled to habeas relief.

The United States Supreme Court has expounded on the Strickland standard relative to claims that trial counsel failed to investigate and present mitigating evidence regarding a defendant's background.  In Wiggins v. Smith, 539 U.S. 510 (2003), the Court held that counsel's failure to investigate and present to the jury mitigating evidence was unreasonable.  There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[21]  The Court found that counsel's decision not to expand their investigation in

_____

to obtain habeas relief, a petitioner must demonstrate that "joinder 'must actually render petitioner's state trial fundamentally unfair and hence, violative of due process.'" Robinson v. Wyrick, 735 F.2d 1091, 1094 (8th Cir. 1984)(quoting United States v. King, 567 F.2d 785, 788 (8th Cir. 1977)).  For the reasons stated by the Supreme Court of Ohio, the Court finds that Mr. Coley cannot demonstrate that he was denied due process under the Robinson holding based on the joinder of the Moore and El-Okdi offenses.

[21]    The Court noted the extensive hardships the petitioner faced during childhood:

> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.  Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen,

the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to Strickland.

The Wiggins Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527.   While Strickland established that strategic decisions can be virtually unchallengeable, the Wiggins Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation. Id.   Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under Strickland.

To discern whether a petitioner was prejudiced by counsel's actions, a habeas court must determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Rompilla v. Beard, 545 U.S. 374, 390 (2005)(internal quotation marks and citations omitted).

The United States Supreme Court recently has issued opinions expounding on Wiggins and how to apply the Strickland standard in the penalty phase of a capital trial. In Bobby v. Van Hook, – U.S. –, 130 S.Ct. 13 (2009), the Supreme Court cautioned

—————————

which she often kept locked.  . . .  Petitioner's first and second foster mothers abused him physically and . . . the father in his second foster home repeatedly molested and raped him.
Id. at 516-7 (citations omitted).

103

habeas courts not to rely too heavily on the American Bar Association's ("ABA")

standards when determining whether counsel's representation was constitutional.  In

reversing the Sixth Circuit's grant of a habeas writ vacating the petitioner's sentence,

the Van Hook Court admonished the Sixth Circuit for treating "the ABA's 2003

Guidelines not merely as evidence of what reasonably diligent attorneys would do, but

as inexorable commands with which all capital defense counsel 'must fully comply.'" Id.

at 17 (quoting Dickerson v. Bagley, 453 F.3d 690, 693 (6th Cir. 2006)).  Instead, the

Van Hook Court advised habeas courts to use restatements of the law only as

guidelines and to look to those in effect at the time of the petitioner's trial.

In another reversal of a circuit court's grant of a habeas writ, the Supreme Court

held in Wong v. Belmontes, – U.S. –, 130 S.Ct. 383 (2009), that the Ninth Circuit erred

when it held that defense counsel were constitutionally ineffective during the penalty

phase of a capital trial.  There, counsel decided against presenting some mitigating

evidence of Mr. Belmontes's character because, under California law, it may have

opened the door for the prosecution to introduce damaging evidence that he had

committed a previous murder.  In reviewing the Ninth Circuit's decision, the Belmontes

Court looked at all the evidence that both the defense and prosecution could have

introduced had counsel chosen a different mitigation strategy.  Id. at 390-91.  The Court

concluded that, given the circumstances, any deficiencies in counsel's performance

were not prejudicial to the outcome of Mr. Belmontes's penalty phase proceeding.

Conversely, in Porter v. McCollum, – U.S. –, 130 S.Ct. 447 (2009), the Supreme

Court reversed the Eleventh Circuit's decision to deny a writ of habeas corpus where

counsel failed to investigate and present evidence of Mr. Porter's military service in two

104

Korean war battles as well as evidence of a troubled childhood and brain dysfunction. Because counsel made no attempts to uncover this information even though it was obtainable, the <u>Porter</u> Court held that the state court had unreasonably concluded that Mr. Porter had failed to meet his burden of proving ineffective assistance.

Here, Mr. Coley claims that trial counsel failed to present evidence regarding his school records, employment history, and evidence regarding his background and character.  He notes that the Supreme Court of Ohio, in performing its independent sentence evaluation, observed that "the defense presented little or no direct evidence as to Coley's character, schooling, or employment history."  <u>State v. Coley</u>, 93 Ohio St.3d at 272.  While the Supreme Court of Ohio did so observe, it also reviewed the extensive evidence counsel presented during mitigation. Relevant portions of the Supreme Court of Ohio's opinion are:

> Several of Coley's relatives testified for the defense, including Karen Armstrong, the sister of Coley's mother; Douglas Bell, Coley's father; and Willie Austin and Martha Davis, Bell's sisters and Coley's aunts. Additionally, Dr. Wayne Graves, a clinical psychologist, testified concerning Coley's mother, Victoria Coley. The testimony of these witnesses and the extensive documentary evidence confirming their testimony establishes that Coley's upbringing can be described as a chaotic nightmare.
>
> Victoria Coley, Coley's mother, was one of nine sisters. Victoria Coley was hospitalized in state mental hospitals some fifteen times between 1977 (when Coley was two years old) to 1991. Victoria also had extensive outpatient treatment when she was not institutionalized. Victoria, who had an IQ in the 65-68 range, was a chronic paranoid schizophrenic. She also suffered from mixed substance abuse and borderline personality disorders. When out of institutions, Victoria used street drugs, drank heavily, and engaged in prostitution to obtain money for drugs. In 1989, Victoria was found not guilty by reason of insanity for the aggravated arson of her home that endangered her children.

Her sister-in-law, Martha Jean Davis, described Victoria as an "oversexed mental patient * * * [who] wouldn't keep her clothes on." She "would strip and run down * * * the street with no clothes on. * * * [S]he would have sex with anyone, anybody, anywhere * * *." Victoria had sex with Davis's ten-year-old son, and reportedly had sex with her own children. When Victoria was institutionalized, her children stayed with relatives. However, Coley and his older brother, Victor, were neglected and malnourished, whether they were with Victoria or relatives. In referring to both Victoria's family and Bell's family, Davis characterized them as "all alcoholics and drug addicts." Children's Service Bureau and other social service records concerning Victoria and her family date from 1975 and document the family's horrific problems and neglect of the children, including Coley.

Douglas Bell, Coley's father, was not a positive father figure. Bell went to prison for five years when Coley was just a few months old. Bell lived with Victoria at various times, but Bell agreed that he has served about six or seven prison terms and had been convicted of burglary, robbery, felonious assault, drug trafficking, and other offenses. After Coley was born, Bell was usually in prison or involved with drugs.

Karen Armstrong, Coley's aunt, testified that Victoria's life went downhill after she became involved with Bell and his family because she used drugs more frequently and engaged in prostitution.

Willie Louise Austin, Bell's sister, stated that her entire family of six brothers and four sisters was not stable. Austin testified that she had been a prostitute and drug addict and that everyone in the family had been drug addicts or alcoholics at some point. The children (Coley and Victor) were forced to fend for themselves, which is "where the panhandling and stealing and selling dope comes in."

Marquita Armstrong, Victoria's sister, testified for the state and identified a letter Coley had written to her acknowledging that he had been taught the difference between right and wrong. Coley stayed with Marquita at times in his childhood and attended church when he did. Marquita admitted that her boyfriend sold drugs when Coley lived with her. She also agreed that she had shot her boyfriend but "[n]ot for selling drugs."

* * *

Although Coley did not speak to the jury, he made an unsworn statement at the sentencing hearing. Coley told the trial court that because of his upbringing and life, "[s]ometimes there's no way to control how you get caught up in things * * *." Coley also sent his "condolences to the El-Okdi family for what happened to their daughter * * * your sister, your

106

friend--but I'm not that monster that was in that alley that night. * * * I ain't that monster * * *."

State v. Coley, 93 Ohio St.3d at 271-2.

It is clear from the record that Mr. Coley's defense counsel presented numerous witnesses to depict his troubled upbringing in the hopes of evoking sympathy from the jury.  Despite this representation of his upbringing, Mr. Coley asserts, counsel failed to present evidence regarding his character, school records, and employment history.  Mr. Coley does not specify what information counsel's further investigation would have yielded.  Nor does he demonstrate that any inadequacies in counsel's mitigation investigation and presentation of evidence to the jury resulted in prejudice to his penalty phase proceedings.

This case is similar to Lorraine v. Coyle, 291 F.3d 416 (6th Cir. 2002), in which the Sixth Circuit held that a habeas petitioner is not entitled to relief based on an ineffective assistance of counsel claim unless he or she can prove that counsel's alleged failures prejudiced the outcome of the state court proceeding.  In Coyle, the petitioner alleged that counsel was ineffective for failing to investigate and present mitigating evidence.  On habeas review, the district court found ineffective assistance based on trial counsel's failure to develop evidence of the petitioner's organic brain damage.  Id. at 434.  The Sixth Circuit reversed, holding that the petitioner failed to demonstrate that trial counsel's failure to investigate prejudiced the outcome of the penalty phase when habeas counsel could find no evidence that the petitioner was actually brain damaged.  Id. at 436.

Like the <u>Lorraine</u> petitioner, Mr. Coley does not state what information trial counsel's investigation into these aspects of Mr. Coley's past would have produced. Thus, he cannot demonstrate that counsel's alleged failure to investigate and present evidence of his school records, employment history, or character evidence would have altered the outcome of penalty phase proceedings.  Without making such a demonstration, this sub-claim fails.

> **b.  Sub-claims (b) – failure to request trial judge to recuse herself, (c) – failure to object to victim impact testimony, (d) – failure to object to State's argument victim performed good deeds, and (e) – failure to object to State's argument that victim felt fear before her death**

Mr. Coley has raised the underlying bases for these sub-claims in other claims raised in the Amended Petition.  Specifically, the Court addressed the substance of sub-claim (b) in grounds for relief 6(d), 11, and 12; sub-claim (c) in ground for relief 4(i); and sub-claims (d) and (e) in grounds for relief 15(b) and (c).  Because the Court found them to be without merit, it necessarily must find that Mr. Coley cannot demonstrate, as he must to prevail under <u>Strickland</u>, that any unreasonable behavior by trial counsel resulted in prejudice to the outcome of his state court proceedings. <u>Strickland</u>, 466 U.S. at 687; <u>Lundgren v. Mitchell</u>, 440 F.3d 754, 770 (6th Cir. 2006). Accordingly, these claims are not well-taken.

> **5.  Ineffective Assistance of Appellate Counsel: Eleventh Ground for Relief**

Mr. Coley essentially raises three sub-claims in this ground for relief.  He alleges that appellate counsel were ineffective for failing to assert ineffective assistance of trial counsel or trial court error claims on appeal based on the letter that Mr. Coley allegedly

sent his brother.  Mr. Coley alleges appellate counsel were ineffective because they failed to request that the trial court unseal the portions of the record containing, <u>inter alia</u>, the letter purportedly authored by him.  He also asserts appellate counsel's ineffectiveness for failing to file a post-conviction relief petition even though appellate counsel was appointed to file one after the direct appeal.  Finally, Mr. Coley claims that appellate counsel copied the brief they filed from another client and re-submitted it to the Supreme Court of Ohio in his case.

A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right.  <u>Evitts v. Lucey</u>, 469 U.S. 387, 396 (1985).  The two-part test enunciated in <u>Strickland</u>, discussed above, is applicable to claims of ineffective assistance of appellate counsel.  Thus, Mr. Coley must demonstrate that his appellate counsel's performance was deficient, and that the deficient performance so prejudiced him that the appellate proceedings were unfair and the result was unreliable.  <u>Strickland</u>, 466 U.S. at 687.  An appellant has no constitutional right to have every non-frivolous issue raised on appeal, <u>Jones v. Barnes</u>, 463 U.S. 745, 750–54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel.  <u>United States v. Perry</u>, 908 F.2d 56, 59 (6th Cir. 1990), <u>cert.</u> <u>denied</u>, 498 U.S. 1002 (1990).  Indeed,

> [m]ost cases present only one, two, or three significant questions . . . .
> Usually, . . . [i]f you cannot win on a few major points, the others are not
> likely to help, and to attempt to deal with a great many in the limited
> number of pages allowed for briefs will mean that none may receive
> adequate attention.  The effect of adding weak arguments will be to dilute
> the force of stronger ones.

109

Jones, 463 U.S. at 752 (*quoting* R. Stern, Appellate Practice in the United States 266 (1981)).  Moreover, an attorney is not required to present an argument on appeal for which there is no good-faith factual support, in order to avoid a charge of ineffective representation.  Krist v. Foltz, 804 F.2d 944, 946–47 (6th Cir. 1986).

None of Mr. Coley's claims has merit.  The Court addressed, and Mr. Coley raised in several areas in the Amended Petition, the issue regarding the trial court's handling of the letter purportedly authored by him.  The Court will not re-address that argument here but finds that Mr. Coley cannot establish that prejudice occurred in his appellate proceedings to obtain relief for this claim.

Moreover, the fact that appellate counsel may have copied portions of a brief from a prior client does not per se demonstrate that counsel were ineffective.  Mr. Coley does not allege that these claims were not applicable to him, merely that counsel used them from another brief.  Without demonstrating that these claims were inapplicable or, more importantly, what claims should have been raised on appeal but were not, this claim must fail.

Finally, the fact that appellate counsel, later appointed to represent Mr. Coley in post-conviction proceedings, did not file a post-conviction brief is not cognizable on habeas review.  The right to counsel "extends to the first appeal as of right, and no further." Pennsylvania v. Finley, 481 U.S. 551, 555 (1987).  It is the source of the right to counsel, combined with the type of proceeding, that implicates a constitutional right to counsel. Id. at 556.  If none exists, there can be no Strickland violation. Id. at 558.  Because Mr. Coley has no right to counsel in post-conviction proceedings, he cannot

110

successfully allege that direct appeal counsel were ineffective for failing to file a post-conviction petition.  Thus, this claim has no merit.

### 6.   No Meaningful Proportionality Review: Fifteenth Ground for Relief

Mr. Coley's fifteenth ground for relief is that the Supreme Court of Ohio did not conduct a constitutionally adequate proportionality review.[22]  Specifically, Mr. Coley claims that the Supreme Court of Ohio improperly excluded cases in its review in which the State sought the death penalty but did not receive it.

A proportionality review is not constitutionally required.  Pulley v. Harris, 465 U.S. 37, 50-51 (1984).  See also McQueen v. Scroggy, 99 F.3d 1302, 1333–34 (6th Cir. 1996), cert. denied, 520 U.S. 1257 (1997)("There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review.").  By statute, however, Ohio requires the appellate courts to engage in a proportionality review.  Under Ohio Revised Code § 2929.05(A):

> In determining whether the sentence of death is appropriate, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.  They shall also review all the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

Ohio Rev. Code § 2929.05(A).

---

[22]  Mr. Coley raised this claim on direct appeal to the Supreme Court of Ohio but the court summarily rejected it.  State v. Coley, 93 Ohio St.3d 253, 270 (2001).

Because Ohio law requires appellate courts to engage in a proportionality review, the review must be consistent with constitutional requirements. Kordenbrock v. Scroggy, 680 F. Supp. 867, 899 (E.D. Ky. 1988), rev'd on other grounds, 919 F.2d 1091 (6th Cir. 1990)(citing Evitts v. Lucey, 469 U.S. 387 (1985)).  Nonetheless, when the state courts have engaged in a proportionality review, the federal habeas court's review is limited.  The habeas court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed." Id. (citing Moore v. Balkcom, 716 F.2d 1511, 1517 (11th Cir. 1983)).  See also Spinkellink v. Wainwright, 578 F.2d 582, 604 (5th Cir. 1978), cert. denied, 440 U.S. 976 (1979)(same).

In Spinkellink, the petitioner argued

that his crime, when compared to other Florida death penalty cases, was insufficiently gruesome or heinous to warrant the death penalty and had highlighted seven other cases in which the Florida Supreme Court had reversed death sentences.  All of these other cases allegedly involved defendants equally or more deserving of the death penalty than he.

Moore, 716 F.2d at 1517–18 (quoting Spinkellink, 578 F.2d at 604).  The court "condemned a federal case by case analysis of the cases used by the state appellate court in its proportionality review as an unnecessary intrusion on the [state] judicial system." Id. (citing Spinkellink).  It held:

A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, 'get out the record' to see if the state court's findings of fact, their conclusions based on a review of similar cases, was supported by the 'evidence' in the similar cases.  To do so would thrust the federal judiciary into the substantive policy making area of the state.

112

Id.  Moreover, when examining an Ohio capital conviction on habeas review, the Sixth

Circuit has stated that, because "proportionality review is not required by the

Constitution, states have great latitude in defining the pool of cases used for

comparison."  Buell v. Mitchell, 274 F.3d 337, 369 (6th Cir. 2001).  Because Mr. Coley's

death sentence does not "shock the conscience," this claim is not well-taken.

### 7. Unconstitutionality of Death Penalty: Eighteenth Ground for Relief

Mr. Coley's eighteenth ground for relief is aimed at the structure of Ohio's capital

punishment scheme.  In this claim, Mr. Coley asserts that Ohio's capital punishment

scheme is unconstitutional on its face.  While some of these sub-claims are

procedurally defaulted, the Court addresses all claims on the merits but is not

persuaded by any of Mr. Coley's allegations.  In summary fashion, the Court will list

below Mr. Coley's allegations, in italics, and thereafter state the reasons they are

unpersuasive.

- *The death penalty violates the Eighth Amendment prohibition against cruel and unusual punishment.*  This argument was rejected in Gregg v. Georgia, 428 U.S. 153 (1976)(holding death penalty *per se* not constitutionally barred).

- *Ohio's scheme is not the least restrictive means of effectuating deterrence.*  The Supreme Court also addressed this point in Gregg.  Noting that imposing criminal punishment is a legislative responsibility, the Court limited its own ability to "require the legislature to select the least severe penalty possible."  Id. at 175.

- *Ohio's scheme is unconstitutionally arbitrary because it allows for prosecutorial discretion to determine whether to seek a capital indictment.*  Once again, in Gregg v. Georgia, 428 U.S. 153 (1976), the Supreme Court rejected this argument under a similar death penalty statute, condoning the discretionary system.

113

- *Ohio's scheme permits the jury to find for a death sentence without first finding that the defendant acted with premeditation and deliberation.*  This argument is groundless as Ohio Revised Code § 2903.01(E) requires no person to be convicted of aggravated murder unless he or she is "specifically found to have intended to cause the death of another . . . ."  Moreover, the United States Supreme Court sanctioned the use of a criminal state of mind less culpable than intent, i.e., reckless indifference, as an acceptable level of culpability to impose the death penalty.  See Tison v. Arizona, 481 U.S. 137, 156 (1986)(affirming death sentence of capital defendant – who took part in prison escape but was not present when murder of kidnapped family occurred – because he possessed a "reckless disregard for human life.").

- *Ohio's scheme is unconstitutional because it fails to establish a standard for determining the existence of mitigating factors.*  While the United States Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," Gardner v. Florida, 420 U.S. 349, 361 (1977), there is no actual criterion stating that the trial judge or jury must identify and articulate the specific factors used to formulate the decision.  Furthermore, Ohio Revised Code § 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors.  By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness." State v. Buell, 22 Ohio St.3d 124, 137 (1986), cert. denied, 479 U.S. 871 (1986).  Thus, no constitutional infirmity is found.

- *Ohio's scheme is unconstitutional because it fails to set a standard of proof for the jury to provide a standard for balancing mitigating factors with aggravating circumstances.*  The United States Supreme Court has determined that a state is not required to give the jury guidance as to its weighing and consideration of the evidence adduced during the mitigation phase. Buchanan v. Angelone, 522 U.S. 269 (1998).

- *Ohio's scheme is unconstitutional because it permits the trier of fact to consider aggravating circumstances at the guilt phase.*  As stated above, the Supreme Court has articulated clearly the constitutional mandates for imposing the death penalty.  In Lockett v. Ohio, 438 U.S. 586 (1978), the Court held that any death penalty statute must allow the sentencer to review all mitigating evidence during the penalty phase, thereby fashioning a sentence befitting the individual defendant.  Because death "is so profoundly different from all other penalties," the Court reasoned, it cannot be imposed without individualizing the sentence. Id. at 605.  The

114

Court further refined the statutory limiting requirement in <u>Zant v. Stephens</u>, 462 U.S. 862 (1983).  In that case, the Court concluded that any death penalty statute must narrow the class of death-eligible defendants from those not death eligible.  <u>Id.</u> at 177.  Specifically, a state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase.  <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 246 (1987).

- *Ohio's death penalty scheme complies with these mandates.*  First, §§ 2929.04(B) and (C) allow the defendant to present, and the fact finder to consider, all statutorily enumerated mitigating factors.  Moreover, § 2929.04(B)(7) permits a fact finder to consider all mitigating factors in addition to those enumerated in the statute.  Finally, the Ohio death penalty scheme satisfies the <u>Zant</u> requirements by demanding the fact finder find the existence of at least one aggravating circumstance set forth in § 2929.04(A).

- *Ohio's scheme is unconstitutional because it fails to provide the sentencing authority with an option to impose a life sentence when it finds that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.*  The Supreme Court rejected the identical argument in <u>Blystone v. Pennsylvania</u>, 494 U.S. 299 (1990).

- *Ohio's scheme is unconstitutional because it imposes a risk of death on those capital defendants who choose to exercise their right to trial.*  In <u>United States v. Jackson</u>, 390 U.S. 570, 582 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial.  In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only a jury to impose the death sentence.  Conversely, in Ohio "a sentence of death is possible whether a defendant pleads to the offense or is found guilty after a trial."  <u>State v. Buell</u>, 22 Ohio St.3d 124, 138 (1986).  Consequently, the Ohio scheme comports with constitutional mandates.

- *Ohio's scheme creates a mandatory death penalty.*  The Court presumes that this argument is essentially the same argument presented above (that the jury must impose a death sentence when it finds the aggravating circumstances outweigh the mitigating factors).  The Court need not readdress this argument here. Without further explanation as to the nature of this claim, the Court cannot address it.

115

- *Ohio's scheme permits the State to argue first and last in the mitigation phase of trial.*  Even if this sequence does place a capital defendant at a disadvantage, and the Court does not so find, this fact does not implicate a constitutional violation.  As long as a state requires the prosecution to prove the existence of all aggravating circumstances, the defendant's constitutional rights are not violated.  Walton v. Arizona, 497 U.S. 639, 649-51 (1990).[23]

- *Ohio's death penalty is applied in an arbitrary and capricious manner.*  Other than bald assertion, Mr. Coley cites no specifics about the Ohio statutory scheme that substantiates his argument.  More importantly, Mr. Coley does not state why the Ohio courts' application of the death penalty statutes runs afoul of United States Supreme Court jurisprudence.

- *Ohio's scheme is unconstitutional because it requires that the pre-sentence report be submitted to the jury once the defendant requests it.*  Although the Fifth Amendment would be violated if a court <u>ordered</u> a defendant to undergo a psychiatric examination, without informing the defendant that his statements can be used against him, and then admitted his statements into evidence during the sentencing phase in order to prove statutory aggravating circumstances, see Estelle v. Smith, 451 U.S. 454 (1981), the Fifth Amendment will not be violated if the defendant requests the psychiatric evaluation himself.  This reasoning is explained in Buchanan v. Kentucky, 483 U.S. 402 (1987):
  A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.  This statement leads logically to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.  The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.
Id. (citations omitted).

- *Ohio's scheme is unconstitutional because it fails to require that the State prove the absence of any mitigating factors.*  This argument was specifically rejected in Walton v. Arizona, 497 U.S. 639, 649–50 (1990).  There the Court held a death penalty scheme requiring the defendant to

---

23    As noted previously, the Supreme Court's decision in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), did not overrule this aspect of the <u>Walton</u> holding.

116

establish mitigating factors by a preponderance of evidence is constitutionally acceptable burden shifting.  This aspect of the <u>Walton</u> holding is unaltered by the Supreme Court decision <u>Ring v. Arizona</u>, 526 U.S. 584 (2002).

• *Ohio's scheme is unconstitutional because the defendant must prove the existence of mitigating factors by a preponderance of evidence.*  This argument is addressed in the previous claim.  The Court will not re-address it.

• *Ohio's scheme is unconstitutional because one of the aggravating circumstances merely repeats an element of the crime and fails to narrow the class of death-eligible defendants.*  <u>See</u> argument regarding aggravating circumstances introduced during guilt phase, <u>supra</u>.

• *Ohio's scheme is unconstitutional because it inadequately tracks cases reviewed when determining the proportionality of the sentence.*  The Court addressed this argument in Mr. Coley's fifteenth ground for relief and will not re-address it here.

• *Ohio's scheme is unconstitutional because it fails to require that the State prove that the death penalty is the only appropriate remedy.*  The United States Supreme Court rejected an argument similar to Mr. Coley's in <u>Blystone v. Pennsylvania</u>, 494 U.S. 299 (1990).  In that case, the defendant challenged the constitutionality of the Pennsylvania death penalty statutes, which, similar to Ohio's, requires that the jury recommend the death penalty if the aggravating circumstances outweigh the mitigating factors.  In upholding this statutory scheme, the <u>Blystone</u> Court determined that the statutes were constitutional because they permitted the sentencer "to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." <u>Id.</u> at 304–05 (*quoting* <u>Penry v. Lynaugh</u>, 492 U.S. 302, 328(1989), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002))(internal quotation marks omitted).  Ohio's death penalty statutes permit the sentencing body to consider all mitigating evidence pursuant to the "catch-all" mitigating factor, Ohio Revised Code § 2929.04(B)(7).[24]  Moreover, the Ohio scheme provides for an

---

[24] That statute states:

(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, . . . , the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a

117

appropriateness review on direct appeal.  Accordingly, this claim for relief is without merit.

## III.  CONCLUSION

The Court now must determine whether to grant a Certificate of Appealability ("COA") for any of Mr. Coley's claims.  The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  Porterfield v. Bell, 258 F.3d 484, 487 (6th Cir. 2001); see also Murphy v. Ohio, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Mr. Coley presented in the Amended Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

---

reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

\*\*\*

(7)  Any other factors that are relevant to the issue of whether the offender should be sentenced to death.

Ohio Rev. Code § 2929.04(B)(7).

> (2)   A certificate of appealability may issue under paragraph (1) only if
> the applicant has made a substantial showing of the denial of a
> constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a <u>constitutional</u> right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in <u>Barefoot v. Estelle</u>, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  <u>Id.</u> at 483.  Thus, the Court determined that

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a
> substantial showing of the denial of a constitutional right, a demonstration
> that, under *Barefoot*, includes showing that reasonable jurists could
> debate whether (or, for that matter, agree that) the petition should have
> been resolved in a different manner or that the issues presented were
> "adequate to deserve encouragement to proceed further."

<u>Id.</u> at 483–04 (*quoting* <u>Barefoot</u>, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." <u>Id.</u> at 484.  A more complicated analysis is required, however, when assessing whether to

119

grant a COA for a claim the district court has determined procedurally defaulted. In those instances, the Court opined, a COA only should issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. (emphasis supplied).

After taking the above standard into consideration, the Court finds that ten issues merit further review. The Court will address each issue and its procedural status below.

The Court will not issue a COA for many of the grounds for relief Mr. Coley raised in the Amended Petition because they are unequivocally procedurally defaulted. Thus, because he never raised grounds for relief 1, 2, 3, 6(c),(d),(f), 8, 9, 10(g), 11(b),(c), 12, 14(a),(b), 16, 17, 19, 20, and 21 at any point in his state court proceedings, they are procedurally defaulted and barred from habeas review. No reasonable jurist would debate this finding.

Similarly, no jurist of reason would take issue with the Court's finding that grounds for relief 4(a),(b),(c),(d),(e),(f),(n), 5(b),(c),(d),(e),10(f),(h), and (i) are procedurally defaulted because they were raised under a different theory in state court. Pursuant to the holding in Lorraine v. Coyle, 291 F.3d 416, 425 (6th Cir. 2002), these claims are defaulted because although they were raised as distinct grounds for relief in state court, they were raised either as part of an ineffective assistance of counsel or prosecutorial misconduct claim in the Amended Petition. Jurists of reason would not debate the conclusion that these claims are procedurally defaulted.

Finally, as stated above, a claim addressed by the Supreme Court of Ohio pursuant to a plain error analysis does not constitute a waiver of procedural default.

120

Seymour v. Walker, 224 F.3d 542 (6th Cir. 2000).  Because grounds for relief 6(a),(b), 7, 14(c) and (e) were all reviewed under this standard, they are unequivocally defaulted. Thus, no COA will issue for these claims.

Of the remaining grounds for relief, there are several that the Respondent asserted were not procedurally defaulted even though they were raised for the first time during Mr. Coley's application to reopen his direct appeal.  As is evidenced by the Respondent's assertions, reasonable jurists could debate the defaulted status of these grounds for relief.

Several grounds for relief that Mr. Coley raised in his application to reopen warrant further merit review.  Consequently, the Court will issue a COA for grounds for relief 4(g) and (h)(ineffective assistance of trial counsel for failure to object to indictment and failure to request that trial judge recuse herself).

While the Court found no merit to sub-claim (g) because the indictment could withstand federal habeas review, reasonable jurists could find that the indictment was deficient pursuant to Ohio law.  Thus, the Court will grant a COA for this sub-claim.

Additionally, the Court grants a COA for ground for relief 4(h).  Although the Court found that any deficiency in trial counsel's performance did not prejudice the outcome of the trial based on its analysis of ground for relief 6(g), a reasonable jurist could conclude that the trial court's knowledge of the existence of a threatening letter that Mr. Coley purportedly wrote to his brother regarding Mr. Moore would result in bias against him.  Thus, a reasonable jurist could find counsel's failure to file a motion for recusal could have prejudiced the outcome of his trial because a trial judge who had no

121

knowledge of this letter might have viewed Mr. Coley's case differently.  Accordingly, the Court issues a COA for ground for relief 4(h).

No COA will issue for ground for relief 4, sub-claim (i).  In that sub-claim, Mr. Coley takes issue with the testimony of several State witnesses and counsel's failure to object to their "victim impact" statements.  A review of the trial transcripts reveals that these witnesses' testimony is completely void of victim impact statements.  Instead, their testimony established the time and place of Ms. El-Okdi's murder as well as Mr. Coley's commission of it.  No jurist of reason would debate the Court's finding on this issue.

The Court will issue a COA for ground for relief 4, sub-claim (j).  As noted above, this claim is substantially similar to claim 4(g).  Because the Court issues a COA for that claim for relief, it issues a COA for 4(j) on similar grounds.

Reasonable jurists would not debate the Court's decision to deny relief for claims 4(k) and (l)(trial counsel's failure to object to prosecutorial remarks).  Because the prosecutor's statements regarding Ms. El-Okdi's good deeds as well as the fear she must have felt prior to her murder were too isolated to alter the outcome of the trial, trial counsel were not ineffective for failing to object to them.  Jurists of reason would agree with this Court's finding.

Similarly, reasonable jurists would not debate the Court's decision to deny relief for sub-claim (m)(ineffective assistance of counsel for failing to object to the specific intent instruction).  As stated above, Mr. Coley does not state why this instruction is infirm.  Without this pertinent information, this claim has no merit.  Thus, no COA will issue for this sub-claim.

122

The Court issues a COA for ground for relief 5(a)(prosecutorial misconduct for using inconsistent theories to convict).  While the Stumpf case seemingly settles this issue, that case involved a defendant who pled guilty rather than a defendant, such as Mr. Coley, who was convicted by a jury.  Thus, a reasonable jurist could conclude that the State's use of inconsistent theories during two separate trials was unconstitutional.  Accordingly, a COA will issue for this claim.

A COA also will issue for ground 10(a)(ineffective assistance of counsel during mitigation).  While it appears counsel made an ample effort to illustrate Mr. Coley's childhood, it is unclear whether an investigation into and introduction of his school records and employment history would have provided the jury with additional mitigating evidence that could have persuaded it to choose a life sentence.  A COA will also issue for sub-claim (b)(ineffective assistance of counsel during mitigation for failing to request that trial judge recuse herself based on Moore letter).  As stated above, a reasonable jurist could conclude that the trial judge's knowledge of a letter that Mr. Coley purportedly wrote to his brother regarding Mr. Moore could have influenced the court's sentencing decision.  Thus, a jurist of reason could conclude that counsel were ineffective for failing to request that she recuse herself from the sentencing proceedings.

No reasonable jurist would debate the Court's holding that 10(c),(d), and (e) (ineffective assistance of counsel during mitigation for failing to object to "victim impact testimony" and statements regarding the victim) are without merit.  Because there was no prosecutorial misconduct for adducing the testimony of the "victim impact" witnesses or for the isolated statements the prosecutor made regarding Ms. El-Okdi, any inaction

123

on the part of trial counsel did not prejudice the outcome of Mr. Coley's mitigation hearing.  No jurist of reason would debate this finding.

Reasonable jurists could debate the Court's conclusion regarding claim 11(a)(ineffective assistance of appellate counsel for failing to raise issue of trial court's review of letter on appeal).  As with the other sub-claims pertaining to the letter that Mr. Coley allegedly authored, the Court finds that reasonable jurists could conclude that the trial court was biased against Mr. Coley based on its knowledge of the letter.  Consequently, appellate counsel could have been ineffective for failing to raise this issue on direct appeal.  A COA will issue for claim 11(a).

The Court issues a COA for ground 13(a)(trial court and jury did not consider mitigating evidence).  Similar to Mr. Coley's ineffective assistance of counsel during mitigation phase claim, the Court finds that jurists of reason could debate whether the trial court and jury heard all relevant mitigating evidence.

No COA will issue for claim 14(d)(jury instruction on aiding and abetting).  As stated in the Opinion, Mr. Coley did not specify why the trial court's instructions on aiding and abetting were constitutionally infirm.  No jurist of reason would conclude that this claim has merit.

Of the claims raised and addressed on the merits by the Supreme Court of Ohio, the Court finds that grounds for relief 6(e) and (g)(trial court error based on unsealing grand jury transcripts and severing counts related to Moore offenses from those related to El-Okdi offenses) warrant further review.  While the Court found that a habeas court should not re-interpret Ohio law to determine whether Mr. Coley demonstrated a "particularized need" to view the transcripts, another court might find it appropriate not

124

only to interpret Ohio law, but find that Mr. Coley did make the requisite showing under that law to view the grand jury transcripts.  Additionally, a reasonable jurist could conclude that it was prejudicial to Mr. Coley for the trial court not to sever the Moore offense counts from the El-Okdi offense counts.  Thus, the Court issues a COA for these sub-claims.

No COA will issue for claims 15 and 18 (proportionality review and unconstitutionality of the death penalty).  The Court will not grant a COA for numerous claims which occur almost pro forma in a capital habeas petition but are routinely denied.

It is therefore ordered that Mr. Douglas Coley's Petition for a Writ of Habeas Corpus be, and the same hereby is, **DENIED**.


IT IS SO ORDERED.


DATE: 5 April 2010                          /s/ Lesley Wells_____
                                            UNITED STATES DISTRICT JUDGE